**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Leonis SMITH, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Karen Lynn WILLIAMS, Defendant–Appellant.**

Nos. 89–50321, 89–50367.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 11, 1990.

Decided June 12, 1990.

Lynn H. Ball, Federal Defender, San Diego, Cal., for defendant-appellant Smith.

Judy Clarke, Federal Defender, San Diego, for defendant-appellant Williams.

Laura J. Birkmeyer, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before NELSON, NORRIS and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We consider whether the district court properly determined appellants' sentences under the federal Sentencing Guidelines.

I

On August 22, 1988, Karen Williams entered the San Diego Trust and Savings Bank, walked up to a teller window, reached into her jacket pocket, removed a handgun, and said: "This is a robbery. I want everything out of your first and second drawer. Hurry up. I want hundreds and thousands."[1] The teller asked Williams where the bag for the money was and Williams responded by telling her to "hurry up." The teller took the money out of her cash drawer and threw it on the counter. Williams grabbed $1,162 and exited the bank through a door where co-defendant Marco Banks was waiting as a "lookout." Williams and Banks then entered a vehicle operated by co-defendant Leonis Smith, who drove them all away.

Subsequent investigation led Federal Bureau of Investigation ("FBI") agents to interview Smith on November 21, 1988 at the El Cajon jail, where he was incarcerated on unrelated charges. Smith admitted to being the "get-away driver" in the robbery and identified Banks as the "lookout" and Williams as the person who committed the

robbery. Smith related that he observed Williams with a black revolver in a leather pouch as he drove himself, Williams, and Banks to the San Diego Trust and Savings Bank on the day of the robbery. Smith also confirmed that Williams entered the bank, Banks held the door, and Smith drove the vehicle. Smith also admitted that Banks gave him $100 after the robbery.

Banks gave a similar report to FBI agents on November 30, 1988. In addition to describing the incident in much the same manner that Smith had, Banks explained that Williams had acquired the black revolver used in the bank robbery from a person named "T." Banks described the revolver as not appearing to be real and as missing a hammer or a trigger. Banks admitted to having given "T" a piece of rock cocaine and stated that Williams may have given "T" twenty dollars for the weapon.

The FBI also interviewed Williams on November 30, 1988. Williams told agents that the bank robbery was Smith's idea and that he suggested that she be the actual robber and that Banks be the "lookout." Williams related a story similar to Banks' about having acquired the gun from a person named "T." Williams, however, stated that Smith had made Williams pay "T" twenty-five dollars for the gun. Williams also told the agents that she believed that the gun was a pellet pistol which did not have a firing pin. Williams finally admitted that it was she who had entered the bank and demanded the money from the teller.

On December 7, 1988, a federal grand jury returned a two-count indictment, charging Smith and Williams with one count of armed bank robbery and one count of conspiracy to commit the same. *See* 18 U.S.C. §§ 2, 371, 2113(a).

On March 20, 1989, Smith entered a guilty plea to the armed bank robbery charge. Prior to sentencing, however, Smith filed objections to the presentence report. The district court overruled these

---

1. The facts in this case are largely undisputed and appear in Smith's presentence report which is part of the record on appeal. *See* 18 U.S.C. § 3742(d).

objections at the sentencing hearing on May 26, 1989. The court imposed a sentence of 100 months to run concurrently to the state sentence Smith was then serving, and a five-year period of supervised release. The court also ordered that Smith pay restitution in the amount of $387.33, which represented one-third of the amount of the loss to the victim bank.

At Smith's sentencing hearing, the district court found, "by a preponderance of the evidence," that the gun which Williams had used to rob the bank was a broken .22 caliber revolver. Reporter's Transcript, May 26, 1989, at 8. However, the district court also found that "even if it were a pellet gun," it was still "an instrument capable of inflicting death or serious bodily injury." *Id.* This was because Williams "brandish[ed]" the weapon, *id.* at 8–9, and used it in a manner that "was designed to arouse fear in the person she was robbing." *Id.*

Furthermore, the district court found that Smith had not accepted responsibility for the crime. Smith gave "clearly self-serving statements to the FBI and further, clearly, self-serving statements to the probation officer." *Id.* at 16. Smith maintained that the bank robbery "was all Banks' and Williams' idea." *Id.* at 17.

On March 27, 1989, Williams entered a guilty plea to the armed bank robbery charge. Prior to sentencing on June 19, 1989, Williams filed objections to the presentence report. The district court overruled these objections at the sentencing hearing. The court then imposed a sentence of seventy-nine months' imprisonment and a five-year period of supervised release. The court also ordered that Williams pay restitution in the amount of $387.33.

At Williams's sentencing hearing, the district court noted a number of inconsistent statements about the gun. The district court found, however, that the gun was "either a revolver ... or a revolver with no pin ... or a pellet pistol." Reporter's

Transcript, June 19, 1989, at 5–6. In any case, the district court found that the gun was "capable of inflicting great bodily injury." *Id.*

Smith and Williams now appeal from the judgments and sentences of the district court.

## II

■ Appellants contend that the district court erred by adding three points to their base offense levels under Guidelines section 2B3.1 on the ground that Williams brandished or displayed a "firearm" or "dangerous weapon" during the commission of the bank robbery. They contend that Williams used an inoperable pellet gun, not a "firearm" or "dangerous weapon" under the Guidelines. We disagree.

The district court made alternative, but not inconsistent, factual findings. At Smith's sentencing hearing, the district court found by a "preponderance of the evidence" that the gun was a broken .22 caliber revolver.[2] Reporter's Transcript, May 26, 1989, at 8. The district court acknowledged, however, that even if the gun was a pellet gun, as had been argued, it was nonetheless capable of inflicting serious bodily injury. At Williams's sentencing hearing, however, the district court determined that the gun "was either a revolver ... or a revolver with no pin [*i.e.*, a firing pin] ... or a pellet pistol." Reporter's Transcript, June 19, 1989, at 5–6.

Given the conflicting testimony, we hold that the district court's factual findings with respect to the nature of the gun were not clearly erroneous. *See* 18 U.S.C. § 3742. In Williams' post-arrest statement, she said that "T," who had sold the weapon to her, told her that the weapon was a .22 caliber revolver. Yet Banks described the gun as missing a hammer or trigger. At her sentencing hearing, Williams suddenly became "more convinced that it was a pellet gun." Reporter's Transcript, May 26, 1989, at 8–9 (statement of

---

**2.** We recently held that the preponderance of the evidence standard is appropriate for factual findings underlying application of the Sentenc-

ing Guidelines. *See United States v. Wilson,* 900 F.2d 1350, 1355 (9th Cir.1990).

district court). The district court was certainly entitled to give little weight to Williams's characterization of the gun at her own sentencing hearing. *See United States v. Buenrostro,* 868 F.2d 135, 138 (5th Cir.1989).

In any case, resolution of this issue does not vary according to which of the district court's findings we look to. Whether the gun was, in fact, a revolver, an inoperable revolver, or a pellet pistol makes no difference for the purposes of sentencing here. Guidelines section 2B3.1(b)(2)(C) provides for an increase of three points where "a dangerous weapon (including a firearm) was brandished, displayed, or possessed." United States Sentencing Commission, *Guidelines Manual* § 2B3.1(b)(2)(C), at 2.24 (1989) [hereinafter *"Guidelines Manual"*]. A revolver certainly is a "firearm." A "firearm" is "any weapon which is designed to or may readily be converted to expel any projectile by the action of an explosive." *Guidelines Manual* § 1B1.1, Application Note 1(e), at 1.14. Moreover, a pellet gun, while not a "firearm," "is a dangerous weapon." *Id.*

■ Furthermore, even an inoperable gun is a "dangerous weapon" when used in the commission of a bank robbery. *See United States v. Laughy,* 886 F.2d 28, 30 (2d Cir.1989). A "dangerous weapon" is "an instrument capable of inflicting death or serious bodily injury." *Guidelines Manual* § 1B1.1, Application Note 1(d), at 1.14. The display of even an inoperable or unloaded gun instills fear in the average citizen and creates the possibility of immediate, violent response. *Id.; McLaughlin v. United States,* 476 U.S. 16, 17–18, 106 S.Ct. 1677, 1678, 90 L.Ed.2d 15 (1986). An inoperable gun can also cause harm when used as a bludgeon. *McLaughlin,* 476 U.S. at 18, 106 S.Ct. at 1678. In recognition of these facts, the new Commentary to the Guidelines makes it explicit that "[w]here an object *that appeared to be a dangerous weapon* was brandished, displayed, or possessed, treat the object as a dangerous weapon." *Guidelines Manual* § 1B1.1, Application Note 1(d), at C.38 (effective Nov. 1, 1989) (emphasis added).[3]

In short, the district court did not err by adding three points to both Smith's and Williams's base offense levels for the brandishing, display, or possession of the gun that was a "firearm" or "dangerous weapon."

### III

■ The district court added one point to Williams's base offense level for robbing a "financial institution." Section 2B3.1(b)(1) of the Guidelines requires a one-point increase in a defendant's offense level when the loss from the crime is between $2,501 and $10,000. *See Guidelines Manual* § 2B3.1(b)(1), at C.55. In the provision important here, however, the section requires the court to "treat the loss for a financial institution or post office as at least $5,000."

Williams states that since the actual loss in the instant case was only $1,162, the district court violated her due process rights by applying a "presumption" of a $5,000 loss. She contends that "a statutory presumption cannot be sustained if there be no rational connection between the fact proved and the ultimate fact presumed." *Tot v. United States,* 319 U.S. 463, 467, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519 (1943). Williams characterizes the "presumption" in Guidelines section 2B3.1(b)(1) as "irrational" and compares it to statutory

---

**3.** Smith would have us rely instead upon certain language in a publication entitled *Questions Most Frequently Asked About the Sentencing Guidelines,* Nos. I & II (Nov. 30, 1988). The Answer to Question number 36 in this publication states that "[b]ecause a toy gun does not meet the requirements of firearm or dangerous weapon, the enhancement should not be applied." We decline to follow this language. There was no evidence whatsoever that Williams possessed a toy gun. More importantly, even if she did, this reasoning would run contrary to our case law. *See United States v. Martinez-Jimenez,* 864 F.2d 664, 666–667 (9th Cir.) (harm that robber creates when carrying toy gun is similar to harm created when carrying unloaded gun), *cert. denied,* —— U.S. ——, 109 S.Ct. 1576, 103 L.Ed.2d 942 (1989). If the gun appeared to be real, even if it was actually a toy gun, the reasoning of *McLaughlin,* 476 U.S. at 17–18, 106 S.Ct. at 1678, would call for the court to characterize the gun as a "dangerous weapon."

presumptions that have been struck down by the Supreme Court. *See, e.g., Leary v. United States,* 395 U.S. 6, 29–54, 89 S.Ct. 1532, 1544–1557, 23 L.Ed.2d 57 (1969) (holding invalid statutory presumption that person found possessing marijuana had also imported the same); *United States v. Romano,* 382 U.S. 136, 144, 86 S.Ct. 279, 284, 15 L.Ed.2d 210 (1965) (presumption that mere presence at an illegal still constituted possession, custody, or control of the same was invalid).

We disagree with the very premise that section 2B3.1(b)(1) sets up some sort of "presumption." Section 2B3.1(b)(1) establishes a one-point increase in a defendant's base offense level where the defendant has robbed a financial institution or post office. It is the nature of the institution and not the amount stolen that is legally operative in the Guideline provision.[4] The $5,000 figure only appears in the provision to refer to the table in section 2B3.1(b)(1) that sets the various levels of enhancement based upon the amount of loss due to the robbery.

The Commentary to the Guideline explains why the Commission chose to implement an automatic one-point enhancement for robberies involving financial institutions and post offices:

> Banks and Post Offices carry a minimum 1 level enhancement for property loss because such institutions generally have more cash readily available, and whether the defendant obtains more or less than $2,500 is largely fortuitous.

*Guidelines Manual* 2B3.1(b)(1), Background at C.56. The district court judge noted just such a fortuity in the instant case. *See* Reporter's Transcript, Vol. 2, March 27, 1989 at 4–5 ("in this particular case, it would be clearly fortuitous and consistent with the rationale of the guidelines that she didn't get over $4,000 [sic]").

Hence, we affirm the district court's decision to add one point to Williams's base offense level for robbery of a financial institution.

## IV

Smith contends that the district court erred by not reducing his base offense level under Guidelines section 3E1.1 for having accepted responsibility for the crime. We disagree.

### A

■ Smith recognizes that his guilty plea does not entitle him to a sentence reduction as a matter of right, but he notes that "[a] guilty plea may provide some evidence of the defendant's acceptance of responsibility." *Guidelines Manual* § 3E1.1, Application Note 3, at 3.23. Indeed, "the point reduction serves the invaluable function of inducing the defendant to plead guilty." *See United States v. Perez–Franco,* 873 F.2d 455, 464 (1st Cir.1989).

Smith, however, would have us focus on his allegedly "voluntary and truthful admission to authorities of involvement in the offense and related conduct." *Guidelines Manual* § 3E1.1, Application Note 1(c), at 3.23. He contends that he admitted his role in the robbery to the FBI agents and also gave the agents enough information to arrest the other two participants in the robbery.

We recognize that "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility," and therefore her determination "is entitled to great deference on review. We will not disturb the district court's determination unless it is *without foundation." Guidelines Manual* § 3E1.1, Application Note 5, at 3.24 (emphasis added); *accord United States v. Gonzalez,* 897 F.2d 1018, 1020 (9th Cir.1990).

The district court's finding here that Smith did not accept responsibility had a firm foundation in facts. Judge Keep found that Smith's versions of the facts noticeably differed when he spoke to the FBI and then to the probation officer pre-

---

**4.** The Sentencing Commission makes this clear in its new amendment to the Guidelines. Effective November 1, 1989, section 2B3.1(b)(1) states that "[i]f the offense involved robbery or attempted robbery of the property of a financial institution or post office, increase by 2 levels." *Guidelines Manual* § 2B3.1(b)(1), at C.55 (effective Nov. 1, 1989).

paring the sentencing report. For instance, while Smith admitted having participated in the robbery when speaking with the FBI agents, he minimized his own involvement when speaking with the probation officer. He then claimed that he did not participate in the robbery of his own desire, but did so out of fear for Banks. Moreover, contrary to his statement to the FBI, Smith told the probation officer that he did not know that Banks and Williams had a gun during the robbery.

Therefore, we hold that the district court did not err by declining to award Smith points for acceptance of responsibility.

**B**

█ Smith also argues that the district court violated his fifth amendment right against self-incrimination by denying him points for acceptance of responsibility. He claims that the court "verbally chastised" him for fearing reprisals from his co-defendants and that the United States Attorney refused to acquiesce in a decision to grant Smith points for acceptance of responsibility unless Smith provided more "exact" information. Smith's Opening Brief at 14.

We recently held, however, that section 3E1.1 does not violate a defendant's fifth amendment right against self-incrimination. *See Gonzalez,* at 1021. "[T]he reduction provided for in Section 3E1.1 is merely a benefit which may be accorded to a defendant if he is able to make the necessary showing. The possibility of leniency in the statute does not make denial of lenient treatment impermissible where the district court determines that the defendant has failed to exhibit the requisite contrition." *Id.* at 1021.

Accordingly, we reject Smith's fifth amendment challenge to the district court's finding that he did not accept responsibility for his crime.

**V**

█ Smith next alleges that the district court erred by not allowing him a downward adjustment in his base offense level for having been a minor or minimal partici-

pant in the crime. *See Guidelines Manual* § 3B1.2. He points out that an adjustment for a mitigating role may be applicable where the defendant was, like him, an aider and abettor of the crime rather than the principal offender. *See Guidelines Manual* § 3B1.2, Background, at 3.6. Smith also characterizes his role in the crime as "peripheral," since he acted merely as a "chauffeur." He states that he was "used" by Williams and Banks and had no role in purchasing the gun.

We decline to reach the merits of this argument, however, because Smith failed to raise it as an issue below. It is well-settled that "[a] party must raise an objection initially to the trial court to preserve it for appeal." *United States v. Hayden,* 860 F.2d 1483, 1485 (9th Cir.1988). We have held that we may consider an issue raised for the first time on appeal if

> (1) there are "exceptional circumstances" why the issue was not raised in the trial court, (2) the new issue arises while the appeal is pending because of a change in the law, or (3) the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court.

*United States v. Carlson,* 900 F.2d 1346, 1349–1350 (9th Cir.1990).

Smith did not request the district court to consider an adjustment for a mitigating role either in his written objections to the presentence report or in his argument at the time of sentencing. There are no "exceptional circumstances" why Smith could not have made such a request in the district court. The failure to make such a request did not arise because of a change in the law while the appeal was pending. Moreover, the issue presented is not purely one of law. The determination of whether a defendant was a minor or minimal participant in a crime is necessarily a fact-dependent inquiry. Accordingly, we decline to reach the merits of Smith's argument on this point.

**VI**

█ Smith alleges that the district court miscalculated his criminal history score by

failing to aggregate certain of his prior convictions. We disagree.

Smith was arrested on October 9, 1980 for stealing a car from a Ford dealership in El Cajon, California. Thereafter, Smith pleaded guilty to felony auto theft and received five years probation. On October 12, 1980, he was arrested for his involvement in a night-time burglary of a Boise Cascade business establishment in Chula Vista, California. Smith pleaded guilty to felony burglary for this crime and received 365 days in jail, five years probation, and was ordered to pay $225 in restitution.

On May 12, 1983, Smith's probation on the two cases was revoked because he had failed to report to his probation officer as directed and had also failed to pay the ordered restitution. Smith was thereafter resentenced on May 31, 1983 to two years imprisonment for each of his two prior felony convictions, with the sentences to run concurrently.

In the present case, the district court assessed Smith three points for each prior conviction. The court derived this assessment from Guidelines section 4A1.1(a), which states that the court must "[a]dd 3 points for each prior sentence of imprisonment exceeding one year and one month." The district court was aware that "[i]n the case of a prior revocation … [the court must] add the original term of imprisonment to any term of imprisonment imposed upon revocation. The resulting total is used to compute the [defendant's] criminal history points…." *Guidelines Manual* § 4A1.2(k)(1), at 4.6.

Smith contends that the district court should have treated his two prior convictions as one offense because, when probation was revoked on each offense, he was sentenced to concurrent prison terms. Smith's theory is that all concurrent sentences must be treated as one sentence for purposes of calculating the defendant's criminal history score.[5] Smith draws his theory from Application Note 11 to section

4A1.2 of the Guidelines, which states in pertinent part:

> Rather than count the original sentence and the resentence after revocation as separate sentences, the sentence given upon revocation should be added to the original sentence of imprisonment, if any, and the total should be counted as if it were one sentence. By this approach, no more than three points will be assessed for a single conviction, even if probation or conditional release was subsequently revoked. If the sentence originally imposed, the sentence imposed upon revocation, or the total of both sentences exceeded one year an one month, the maximum three points would be assigned.

*Guidelines Manual* § 4A1.2, Application Note 11, at 4.8.

Smith's argument is meritless. The application gives clear direction that all sentences based on one *conviction* are to be aggregated, while sentences based on different convictions should be computed separately. The fact that the sentences were to run concurrently has no legal effect here. *See United States v. Jones*, 898 F.2d 1461 (10th Cir.1990) ("action taken by the sentencing court at a parole revocation hearing *does not change the underlying sentences' separate and independent nature*"); *cf. United States v. Gross*, 897 F.2d 414 (9th Cir.1990) (sentencing at single hearing for multiple convictions does not render those convictions "related cases" for the purposes of Guidelines § 4A1.2(a)(2)); *United States v. Flores*, 875 F.2d 1110, 1114 (5th Cir.1989) ("[s]imply because two convictions have concurrent sentences does not mean that the crimes are 'related' ").

AFFIRMED.

---

5. Smith also argues that the same theory should apply to his prior grand theft and forgery convictions, for which Smith received concurrent sentences after his parole was revoked. For the reasons stated below, Smith's theory has no more merit when applied to his grand theft and forgery convictions than it does when applied to his felony auto theft and burglary convictions.