# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

———————

No. 96-1419

———————

United States of America,      *
       *
        Appellee,     *
       *  Appeal from the United States
     v.        *  District Court for the
       *  District of South Dakota.
Peter Larson,     *
       *
        Appellant.     *

———————

Submitted:  September 11, 1996

Filed:  April 10, 1997

———————

Before MAGILL, JOHN R. GIBSON and BEAM, Circuit Judges.

———————

MAGILL, Circuit Judge.

We revisit this case for the sixth time.[1]  Peter Larson appeals his conviction of theft of United States' property, 18 U.S.C. § 641; retention of stolen United States' property, 18 U.S.C. § 641; failure to file a customs report when exporting

———————

[1]Black Hills Inst. v. United States Dep't of Justice, 967 F.2d 1237 (8th Cir. 1992) (civil suit regarding ownership of Tyrannosaurus rex fossil); Black Hills Inst. v. United States Dep't of Justice, 978 F.2d 1043 (8th Cir. 1992) (Tyrannosaurus rex civil suit); Black Hills Inst. v. South Dakota Sch. of Mines & Tech., 12 F.3d 737 (8th Cir. 1993) (Tyrannosaurus rex civil suit), cert. denied, 115 S. Ct. 61 (1994); In re Larson, 43 F.3d 410 (8th Cir. 1994) (district judge's refusal to recuse self); Black Hills Inst. v. Williams, 88 F.3d 614 (8th Cir. 1996) (Tyrannosaurus rex civil suit).

monetary instruments, 31 U.S.C. § 5316(a)(1)(A); and failure to file a report when importing monetary instruments, 31 U.S.C. § 5316(a)(1)(A). Larson's arguments address the sufficiency of the evidence, the scope of the regulatory definition of monetary instrument, the application of the Sentencing Guidelines, and the sentencing judge's[2] failure to recuse himself.  We affirm.

## I.

As president and majority stockholder, Larson headed a commercial fossil business, the Black Hills Institute of Geological Research (the Institute).  The Institute's activities focused on the collection, preparation, and marketing of fossils.  The Institute's most notable success story was the discovery of "Sue," a 65-million-year-old Tyrannosaurus rex fossil.  However, with success came not only public notoriety and attention, but also the attention of law enforcement officials.

On May 14, 1992, federal officials raided the Institute to seize evidence.  Among the fossils seized were crinoid fossils, a marine invertebrate, which Larson had collected from the Gallatin National Forest in Montana, and various fossils from the Buffalo Gap National Grasslands in South Dakota.  Both parcels of land belong to the United States and Larson had not been authorized to remove the fossils.

In addition, as part of his activities for the Institute, Larson made repeated trips to Peru to collect fossils.  This collection included excavation and export of fossilized remains of baleen whales.  One such fossil, "Maya," was sold to a Japanese

---

[2]The Honorable Richard H. Battey, Chief Judge, United States District Court for the District of South Dakota.

-2-

buyer for $225,000. Yet, fossils being exported from Peru were presented to customs as having scientific value only.

In preparation for a March 1990 trip, Larson withdrew $15,000 from the Institute's bank account in order to pay his expenses in Peru, including the cost of fossil collection. When Larson left for Peru on March 9, 1990, carrying more than $10,000, he failed to file Customs Form 4790, a Report of International Transportation of Currency or Monetary Instrument.

Larson's Institute travel also included a 1991 trip to a Tokyo fossil show to sell fossils. While in Japan, Larson purchased $31,700 in traveler's checks. On June 8, 1991, Larson returned to the United States with the traveler's checks. Larson failed to complete Customs Form 4790 which must also be submitted when importing more than $10,000 worth of monetary instruments into the United States.

Based on the Institute's dinosaur-related activities, the government obtained a thirty-nine count indictment. Larson was charged with thirty-six counts. The charges focused on the illegal collection of fossils and included counts of conspiracy, obstruction of justice, theft of United States' property, and customs violations.

During the course of his trial, Larson unsuccessfully attempted to have the trial judge recuse himself. At a status hearing on a possible plea bargain discussed in the media, the trial judge expressed disapproval of the reported agreement, calling it a government capitulation. In a subsequent communication, the trial judge stated that his comments were contrary to Federal Rule of Criminal Procedure 11(e), which prohibits a judge's participation in plea agreement discussions.

However, he declined to recuse himself.  Larson petitioned this Court for a writ of mandamus to remove the trial judge, which was denied.  In re Larson, 43 F.3d 410 (8th Cir. 1994).

A jury convicted Larson of one count of theft of United States' property not in excess of $100, one count of retention of stolen United States' property not in excess of $100, and two counts of failure to file a customs report when transporting monetary instruments.  Larson was sentenced to twenty-four months confinement, two years supervised release, a fine of $5000, and a special assessment of $150.

The district court's computation of Larson's sentence started with the customs violations.  The court began with a base offense level of 11.  See U.S.S.G. § 2S1.3 (a base offense level of 6 plus the number of offense levels called for by the value of the funds table in § 2F1.1).  The court then found that the specific offense characteristic in § 2S1.3(b)(1) applied to Larson.  This section dictates an increase by two levels "[i]f the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity."  U.S.S.G. § 2S1.3(b)(1).  Next the court found that the § 3B1.1(a) role in the offense adjustment applied.  This adjustment mandates a four level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  These computations result in an adjusted offense level of 17.

The district court then turned to the property offenses.  Retention of stolen United States' property not in excess of $100 and theft of government property not in excess of $100 have a base offense level of 4.  U.S.S.G. § 2B1.1.  Again the court added four

levels pursuant to § 3B1.1(a) for Larson's role in the offense.  Thus, the adjusted offense level was 8.

The district court next determined that the combined adjusted offense level for multiple counts to be level 17.  See U.S.S.G. § 3D1.4(c). Finally, looking to the sentencing table, the district court found the sentencing range to be from twenty-four to thirty months, given Larson's criminal history category of I and his offense level of 17.  The district court imposed a sentence of twenty-four months.

On appeal, Larson makes the following arguments: (1) that his retention of invertebrate fossils from forest service lands was not a crime in light of forest service regulations permitting the noncommercial collection of invertebrate fossils; (2) that he lacked the requisite knowledge that it was illegal to take in excess of $10,000 out of the country without filing a customs report; (3) that he lacked the requisite knowledge that it was illegal to bring in excess of $10,000 in restrictively endorsed traveler's checks into the country without filing a customs report; (4) that the requirement of filing a customs report when bringing in excess of $10,000 into the country does not apply to traveler's checks restrictively endorsed; (5) that applying § 2S1.3(b)(1) of the United States Sentencing Guidelines, which increases the sentence when unreported funds are exported for the purpose of illegal activity, was improper because he did not intend to use the funds unlawfully; (6) that because Larson's role in the offense was not that of the organizer and leader of a criminal activity involving five or more participants or that because he was not extensively involved, applying § 3B1.1 of the Sentencing Guidelines was improper; and (7) that the sentencing judge improperly refused to recuse himself following a Rule 11(e) violation.

## II.

Larson's first three arguments concern the sufficiency of the evidence. In reviewing a claim of insufficiency of the evidence, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in the original). All reasonable inferences are also drawn in favor of the prosecution. <u>United States v. Perkins</u>, 94 F.3d 429, 436 (8th Cir. 1996), <u>cert. denied</u>, 117 S. Ct. 1004 (1997).

Larson's first argument uses a 1986 Forest Service regulation permitting the noncommercial harvesting of invertebrate fossils. <u>See</u> 51 Fed. Reg. 30355-356 (1986), <u>codified at</u> 36 C.F.R. § 261.9(i) (1987). Larson claims that this regulation renders his retention of invertebrate fossils, harvested in 1984 and 1985, not a crime as a matter of law. Assuming that this regulation benefits Larson, Larson's argument hinges on his fossil harvesting having been noncommercial. Thus, Larson contends that, though he removed the harvested fossils, there is not sufficient evidence that his fossil harvesting was commercial. We find this argument to be meritless.

Clearly, a rational trier of fact could have found beyond a reasonable doubt that Larson removed the fossils for commercial purposes. Larson was the head of a commercial fossil business. The Institute was organized to sell fossils such as these. The fossils Larson harvested were stored in the Institute's business warehouse. The jury could properly have relied on this evidence to infer that the fossils were taken by Larson for a commercial purpose.

Next, Larson argues that the government failed to meet its burden of showing that Larson possessed the knowledge that it was illegal to take in excess of $10,000 out of the country without filing Customs Form 4790. See Ratzlaf v. United States, 510 U.S. 135, 137 (1994) (to establish that defendant willfully violated reporting statute, the prosecution must prove defendant acted with knowledge that conduct was unlawful).[3] We conclude that there was sufficient evidence to show that Larson had the requisite knowledge.

The record reveals that Larson is an experienced traveler. Upon re-entry into this country from a trip abroad, travelers are routinely given a Customs Form 6059B. This form details the requirement of filing a report on Customs Form 4790 when taking out of or bringing into the United States more than $10,000. Prior to his trip to Peru in 1990, Larson had traveled to South America in 1985, 1987, and 1989. These prior trips raise the strong inference that Larson had repeatedly signed Customs Form 6059B, declaring that he had read it. This evidence is sufficient for a reasonable jury to conclude that Larson was aware of the reporting requirement.

Larson also argues that the government has not met its burden of showing that he knew that it was illegal to bring more than $10,000 in traveler's checks in any form into the country without filing a customs report. Ratzlaf, 510 U.S. at 137 (knowledge requirement). As discussed above, there was sufficient evidence

---

[3]The specific reporting statute interpreted by the Ratzlaf Court, 31 U.S.C. § 5322(a), was subsequently amended by Congress to delete the wilfulness requirement. See United States v. Griffin, 84 F.3d 912, 925 (7th Cir.) (noting change in law), cert. denied, 117 S. Ct. 495 (1996); United States v. Zehrbach, 47 F.3d 1252, 1262 n.7 (3d Cir. 1995) (same).

for any reasonable jury to conclude that Larson, as an experienced international traveler, had repeatedly completed Customs Form 6059B and was aware of its contents. Form 6059B explicitly states that the reporting requirement applies to traveler's checks. See Tr. Ex. 443 (reporting requirement applies to "more than $10,000 (U.S. or foreign equivalent, or a combination of the two) in coin, currency, traveler's checks or bearer instruments such as money orders, checks, stocks or bonds" (emphasis added)), reprinted in Appellee's Add. at 3-4.

Customs Form 6059B does not distinguish between restrictively and nonrestrictively endorsed traveler's checks. Form 6059B simply lists "traveler's checks." Therefore, there is sufficient evidence for a reasonable jury to conclude that Larson was aware that the reporting requirement applied to all traveler's checks whether restrictively endorsed or not.

## III.

Larson not only argues that he did not have the requisite knowledge that the reporting requirement applied to all traveler's checks, he further argues that the requirement itself does not apply to restrictively endorsed traveler's checks. We find that the reporting requirement applies to traveler's checks in any form.

The reporting requirement applies to "monetary instruments." 31 U.S.C § 5316(a)(1). The 1990 Code of Federal Regulations defined monetary instruments to include traveler's checks in any form. See 31 C.F.R. § 103.11(m) (1990).[4] The plain meaning of "in

---

[4]31 C.F.R. § 103.11(m) (1990) provides:

(m) Monetary instruments. (1) Monetary instruments include:
    (i) Currency;
    (ii) Traveler's checks in any form;
    (iii) All negotiable instruments (including personal checks, business checks, official bank checks, cashier's checks, third-party checks, promissory notes (as that term is defined in the Uniform Commercial Code), and money orders)

-8-

any form" includes traveler's checks, whether restrictively endorsed or not.

We also reject Larson's argument that because "monetary instrument" is defined as including both traveler's checks and "all negotiable instruments," 31 C.F.R. § 103.11(m)(iii), that the traveler's checks included must be negotiable. The definition of monetary instrument also includes currency, 31 C.F.R. § 103.11(m)(i), which is not a negotiable instrument. Thus, the reference to "all negotiable instruments," 31 C.F.R. § 103.11(m)(iii), does not limit the other sections enumerated within the definition of monetary instrument. Second, another provision of the regulations provides for an exemption for a restrictively endorsed traveler's check "that is in the collection and reconciliation process after the traveler's check has been negotiated." 31 C.F.R. § 103.23(c)(8) (1990). If we were to accept Larson's contention that the reporting requirement does not apply to restrictively endorsed traveler's checks, this provision

---

that are either in bearer form, endorsed without restriction, made out to a fictitious payee (for the purpose of § 103.23), or otherwise in such form that title thereto passes upon delivery;
(iv) Incomplete instruments (including personal checks, business checks, official bank checks, cashier's checks, third-party checks, promissory notes (as that term is defined in the Uniform Commercial Code), and money orders) signed but with the payee's name omitted; and
(v) Securities or stock in bearer form or otherwise in such form that title thereto passes upon delivery.
(2) Monetary instruments do not include warehouse receipts or bills of lading.

would be rendered superfluous. Accordingly, we reject this interpretation. See Dryden v. Lou Budke's Arrow Fin. Co., 661 F.2d 1186, 1189 (8th Cir. 1981) (per curiam) (rejecting interpretation which would render a regulation's provision surplusage).

We conclude that the reporting requirement found in 31 U.S.C. § 5316(a)(1) applies to traveler's checks in any form, whether restrictively endorsed or not.

**IV.**

Larson's next set of arguments addresses the application of the Sentencing Guidelines. We find no errors in the district court's application of the guidelines.

Section 2S1.3(b) lists specific offense characteristics for sentencing a defendant for failing to file currency and monetary instrument reports. U.S.S.G. § 2S1.3(b) (1995). Subsection (b)(1) provides for a two level increase where the funds were known to be the proceeds of unlawful activity or intended to promote unlawful activity. U.S.S.G. § 2S1.3(b)(1) (1995). Here, the district court made two findings of intent to promote unlawful activity. By a preponderance of the evidence, the court found both that Larson intended the funds to: (1) promote the unlawful exportation of fossils from Peru; and (2) promote an unlawful conspiracy to take fossils from United States' public lands.[5] See Tr. of Evidentiary

_____

[5]For sentencing purposes, the district court found that a conspiracy existed. The court made this finding despite the fact that the jury was unable to agree on the conspiracy charge. As the district court states:

> Much has been said about the hung counts. The jury was unable to agree. I referred to them briefly and in looking at all of the evidence in this case, the Court does find that there was this conspiracy to violate federal law . . . .

Tr. of Evidentiary Hr'g at 61. See also Supp. Sentencing Mem. at 8 ("The Court has found by a preponderance of the evidence that a conspiracy existed . . . .").

-10-

Hr'g at 63-64 ("[T]here are two findings that the Court makes in this case concerning 2S1.3(b)(1), to increase the offense level by two levels."); Supp. Sentencing Mem. at 5 (noting that "[t]he funds were used to promote the conspiratorial conduct of the illegal removal of fossils from public lands").[6]

---

Reviewing this finding for clear error, we uphold the district court's finding that a preponderance of the evidence demonstrates that Larson was involved in a conspiracy to violate federal law. United States v. Casares-Cardenas, 14 F.3d 1283, 1288 (8th Cir.) ("Factual questions regarding sentencing decisions are, of course, reviewed under a clearly erroneous standard."), cert. denied, 115 S. Ct. 147 (1994). Certainly, the district court can find a conspiracy by a preponderance of the evidence, even after the jury has failed to agree on a similar finding applying the higher beyond a reasonable doubt standard. See United States v. Watts, 117 S. Ct. 633, 638 (1997) (per curiam) (sentencing court may consider acquitted conduct if it has been proven by a preponderance of evidence).

[6]In response to Larson's Motion to Supplement the Record, his motion for release, and the government's response, this Court remanded the case to the district court for the following limited purposes:

1. To review and determine the validity of the Peruvian violation with respect to the Sentencing Guidelines applied in this case; and

2. To reconcile the jury's failure to agree on the conspiracy charged in Count I of the indictment with the finding of an ongoing conspiracy as discussed in the Supplemental Sentencing Memorandum filed January 29, 1996.

Order of Dec. 23, 1996 at 1. This Court is appreciative of the district court's clarification of its own previous findings. However, in affirming the district court, this Court does not rely on any new findings which may have been made within the district court's Response To Limited Remand Order.

-11-

On appeal, Larson mistakenly combines the district court's two findings of fact, characterizing the district court's findings, in pertinent part, as:

> [T]hat Peter Larson went to Peru to carry on this "conspiracy," even though there was absolutely no evidence, whatsoever, that Peter Larson, or any other person, for that matter, had any idea that the law of Peru precluded the excavation of fossils, or any evidence that the alleged U.S. "conspiracy" ever extended its misdemeanor tentacles to Peru.

Appellant's Br. at 35. However, the district court made two distinct factual findings of intent, either of which could sustain the application of § 2S1.3(b)(1). Cf. United States v. Smith, 905 F.2d 1296, 1299-1300 (9th Cir. 1990) (affirming sentencing based on district court's alternative, but not inconsistent, fact finding that gun was inoperable revolver or pellet gun). Because the district court's finding that Larson intended to promote the conspiracy is sufficient to support the application of § 2S1.3(b)(1), we need not reach the question of whether Larson's exportation of fossils from Peru was unlawful under Peruvian law.[7]

We conclude that the district court's finding that Larson intended the funds to promote an unlawful conspiracy was not clear

---

[7]There is no challenge to the fact that the funds were intended to be used to export fossils from Peru. Rather, the issue at sentencing was whether the export of fossils was unlawful under Peruvian law. The determination of foreign law is a question of law that can be established using any relevant source. See Fed. R. Crim. P. 26.1; see also Fed. R. Civ. P. 44.1. The district court found that when Larson traveled to Peru in 1990, commercial exportation of fossils was an unlawful activity. This finding was based primarily on conflicting expert testimony regarding the meaning of Peruvian Law No. 24047. See Tr. of Evidentiary Hr'g at 7-8, 32-33, 62-63; Supp. Sentencing Mem. at 9-10.

error.  <u>United States v. Mitchell</u>, 31 F.3d 628, 633 (8th Cir. 1994) (standard of review).  The conspiracy involved the Institute's illegal appropriation of fossils from United States' public lands.  There is sufficient evidence to conclude, for both Larson's exportation of funds to Peru, which were then used to acquire fossils that were later sold, and Larson's direct importation of funds from Japan, were intended by Larson to produce proceeds for the Institute that would promote its ongoing conspiratorial enterprise.  Therefore, because the funds that Larson failed to report were to aid an unlawful conspiracy, the two level increase called for by § 2S1.3(b)(1) of the Sentencing Guidelines was properly applied.

Larson next argues that the district court improperly applied Sentencing Guideline § 3B1.1(a).  Section 3B1.1 lists adjustments based on the defendant's role in the offense.  Subsection (a) provides for a four level increase where the defendant's role was that of an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  <u>See</u> U.S.S.G. § 3B1.1(a).

The district court's interpretation of the Sentencing Guidelines is a question of law subject to de novo review, while its factual determinations are subject to review only for clear error.  <u>United States v. Lamere</u>, 980 F.2d 506, 510 (8th Cir. 1992).  We find that, as the head of the business, Larson's role in the illegal fossil related activities was that of an organizer or leader of five or more participants or was otherwise extensive.  The application of § 3B1.1(a) was therefore proper.[8]

_____

[8]Larson further claims that, as applied to him, amendment 345 to the Introductory Commentary of Chapter 3, Article B of the Sentencing Guidelines violates the Ex Post Facto clause of the Constitution.  U.S. Const. art. I, § 9, cl. 3.  The November 1, 1990 amendment calls for the consideration of all conduct in determining a defendant's role in an offense, not just the elements and acts cited in the count of conviction.  <u>See</u> U.S.S.G. amend. 345.  If a change in the Sentencing Guidelines does not amount to a substantive change in law, but merely restates or clarifies existing law, the change does not offend ex post facto concerns.  <u>See</u> <u>United States v. Cooper</u>, 35 F.3d 1248, 1252 (8th Cir. 1994), <u>cert. granted & opinion vacated</u>, 115 S. Ct. 1820 (1995), <u>prior opinion reinstated</u>, 63 F.3d 761, 763 (8th Cir. 1995) (per curiam), <u>cert. denied</u>, 116 S. Ct. 1548 (1996).  Because amendment 345 only

**V.**

Finally, Larson argues that the district court erred when it refused to recuse itself. We disagree.

To mandate recusal of a judge because of opinions formed in the course of proceedings, a judge must display such a deep-seated favoritism or antagonism that fair judgement is impossible. See Liteky v. United States, 510 U.S. 540, 555 (1994). "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Id.

Federal Rule of Criminal Procedure 11(e) states that attorneys for each side may engage in discussions with a view toward reaching a plea agreement and that the court shall not participate in these discussions. "Courts have consistently interpreted Rule 11(e) as a bright line rule barring any court participation in the plea

---

clarifies the interpretation of § 3B1.1, it is not a substantive change in the guideline. United States v. Montague, 29 F.3d 317, 324 n.5 (7th Cir. 1994); United States v. Mir, 919 F.2d 940, 945 (5th Cir. 1990). Thus, applying the amendment to conduct before its adoption does not violate the Ex Post Facto clause. United States v. Scarano, 975 F.2d 580, 587 (9th Cir. 1992); contra United States v. Saucedo, 950 F.2d 1508, 1513-16 (10th Cir. 1991).

-14-

bargaining process."  In Re Larson, 43 F.3d at 415 (citing United States v. Olesen, 920 F.2d 538, 540 (8th Cir. 1990)).

Even assuming that the district court was correct that its comments violated Rule 11(e), we do not find that the violation of Rule 11(e) in this case mandated a new sentencing judge.  Recusal is required only if the violation is such that the sentencing judge has displayed such a deep-seated favoritism or antagonism that fair judgment is impossible.  See Liteky, 510 U.S. at 555.  Here, we do not find the requisite level of bias or partiality.

Larson cites United States v. Adams, 634 F.2d 830 (5th Cir. 1981), in support of his argument that a Rule 11(e) violation mandates a new trial judge for sentencing.[9]  However, Adams is distinguishable.  In Adams, the trial judge participated in the plea agreement discussions up to the point of seemingly preapproving the agreement and the trial judge became upset when the plea bargain was not taken.  Id. at 832-33.  In this case, the trial court did not participate to any comparable degree.  Furthermore, the Fifth Circuit in Adams did not find that constitutionally prohibited prejudice required a new sentencing judge; rather, that court used its supervisory power over the lower federal court.  Id. at 836.

_____

[9]In this Court's rejection of defendant's petition for a writ of mandamus, Adams was noted for the proposition that, assuming a violation of Rule 11(e), the defendant could request a different sentencing judge.  See In Re Larson, 43 F.3d at 416 n.7.  However, this invitation to request a new sentencing judge was not a declaration of an entitlement to a new sentencing judge.

-15-

## VI.

For the above reasons, the judgment of the district court is affirmed.

BEAM, Circuit Judge, concurring and dissenting.

I am troubled by the result we reach in this case. Nonetheless, I reluctantly concur in the court's opinion affirming the guilt phase of the trial, although, in my view, the convictions barely survive reasonable analysis on both the law and the facts. I do believe, however, that the sentencing process was fatally flawed and should be reversed. Accordingly, I concur in part and dissent in part.

As the court notes, this case had its genesis in a quarrel over the care, custody and ownership of the 65-million-year-old remains of a tyrannosaurus rex named "Sue" discovered in 1990 on a South Dakota ranch. Black Hills Inst. of Geological Research v. United States Dep't of Justice, 967 F.2d 1237, 1238-39 (8th Cir. 1992) (Black Hills I). The roots of the dispute appear to extend into the murky depths of an earlier and ongoing argument between and among public, academic and commercial collectors and curators vying for control of archaeological remains worldwide. The criminal prosecutorial arm of the United States was apparently recruited to participate in this continuing battle and it, in turn, enlisted the aid of the Federal Bureau of Investigation and the South Dakota National Guard. Id. at 1239. This resulted in an armed invasion of the Institute's headquarters in Hill City, South Dakota, designed to carry out a search for and accomplish the seizure of Sue. Id.

The criminal act alleged at that time was a violation of the Antiquities Act, 16 U.S.C. § 433. Black Hills Inst. of Geological Research v. United States Dep't of Justice, 978 F.2d 1043, 1044 (8th Cir. 1992) (Black Hills II). The maximum punishment for violating the Antiquities Act is a $500 fine and ninety days imprisonment. 16 U.S.C. § 433. This purported transgression seems to have long since been forgotten, and Sue is nowhere to be found within the four corners of the present criminal prosecution.

A bitter legal battle between the United States and the Institute over ownership of Sue continued for several years with this court acting as part-time umpire. Black Hills Inst. of Geological Research v. South Dakota Sch. of Mines & Tech., 12 F.3d 737 (8th Cir. 1993) (Black Hills III). Although not a part of the record, press reports indicate that the beneficial owner of the land upon which the discovery was made has now emerged triumphant, and he proposes to auction Sue off to the highest bidder, public, private, academic or collector through the good offices of the fabled Sotheby's Auction House in New York, New York. The estimated value is in the area of one million dollars.[10] Malcolm W. Browne, "Well-Preserved T. Rex Bones May Get $1 Million at Auction," N.Y. Times, Nov. 16, 1996 at 1, 8.

At the same time, the criminal indictment limped along until late 1994 when a South Dakota newspaper disclosed that the case was about to be concluded through a plea agreement favorable to

---

[10]This sum would apparently be "net" the cost of excavation of the fossil, which cost purportedly amounted to $209,000. The land owner also received and apparently retained $5,000 paid by the Institute for permission to excavate. We denied a claim by the Institute for the excavation costs by affirming the district court's disallowance of an equitable or statutory lien for this amount. Black Hills Inst. of Geological Research v. Williams, 88 F.3d 614 (8th Cir. 1996) (Black Hills V).

Larson.  <u>In re Larson</u>, 43 F.3d 410, 411 (8th Cir. 1994) (<u>Black Hills IV</u>).
At that point, the trial judge, in admitted violation of Federal Rule of
Criminal Procedure 11(e), upset progress toward the consummation of the
apparent arrangement, describing it, in part, (based on what the judge saw
in the newspaper) as a "capitulation by the government."  <u>Id.</u>  This, of
course, sent the federal prosecutors scurrying back to the drawing board.
The recent thirty-nine count prosecution resulted, with thirty-six of the
counts directed at Larson.  After trial, the jury convicted Larson of two
minor counts of theft involving property of less than $100 in value and two
rather exotic customs violations both involving activities carried out in
foreign nations: one occurring prior to the discovery of Sue and one prior
to the search of the Institute's headquarters.

While the matter probably should have been disposed of by the plea
agreement reported in the press, I now reluctantly agree with the court
that, given the test we must apply at this point, <u>United States v.
Shoffner</u>, 71 F.3d 1429, 1433 (8th Cir. 1995) (review must be in light most
favorable to verdict); <u>United States v. Jenkins</u>, 78 F.3d 1283, 1287 (8th
Cir. 1996) (reverse only if a jury must have entertained reasonable doubt),
there is enough credible and admissible evidence to affirm the convictions
even though they are based upon hotly disputed, barely viable and generally
unenforced legal theories.  Indeed, as correctly pointed out in Larson's
brief, good faith disagreement exists as to the proper interpretation of
both the foreign law involved and the federal statutes and rules enforced
in this prosecution.

I disagree, however, with the sentence imposed.  In its sentencing
guideline calculations, the trial court seems to have generously exercised
its discretion to enhance the penalties arising from the defendant's
participation in relatively minor

crimes.  Further, the weighty sentence was, in my view, inappropriate given the questionable presentations at trial concerning the existence of and the substance of the Peruvian law at issue.  Overall, the penalty process resulted in a prison sentence well above that called for given the minimal and uncertain nature of the offenses, especially the theft offenses involving property of less than $100 in value.[11]

Sentencing enhancements based on uncharged or acquitted conduct, as in this case, must rely on behavior that is (1) proven by a preponderance of the evidence and (2) part of the "relevant conduct" of the offense of conviction.  A review of the trial record shows that the rulings survive the evidentiary standard, but fail the nexus requirement.

Although acquitted of all conspiracy allegations by the jury, the district judge found, for sentencing purposes, that a conspiracy to collect fossils from federal land existed.[12]  Sentencing Tr. at 30.  All of the enhancements flow from this finding.  Since it is reversible error to fail to impose applicable enhancements, Hall v. United States, 46 F.3d 855, 859 (8th Cir. 1995), it is difficult to evaluate the enhancements without addressing the predicate finding of conspiracy.

---

[11]The probation officer's sentencing guideline calculation for the trial court, made via the presentence report, proposed no enhancement for Larson's role in the offense and no enhancement for any purported obstruction of justice, leading to an offense level no higher than 12, which, in turn, provided for a sentence of from 10 to 16 months with the option of one half of the time being served under supervised release.  I agree with this more minimal analysis contained in the presentence report.

[12]The judge's exact words were that he found "based upon the greater weight of the evidence, a conspiracy . . . ."  Sentencing Tr. at 30.  Although he did not use the term "preponderance," I assume that the judge's expression is equivalent.

While my review of the transcript left me convinced that there was no conspiracy, there was some evidence supporting the government's theory. Furthermore, I have not located a case reversing a sentencing enhancement on the grounds that the acquitted conduct was insufficiently proven. In this case, however, there seems to have been s ome predisposition to find that a conspiracy did, indeed exist. Tr. of Hr'g at 26-27 (Sept. 21, 1994) (comments regarding plea bargain reported by press).

The enhancements were then imposed on the grounds that the customs violations[13] in some way advanced this judge-found conspiracy. Although relevant conduct is defined broadly, U.S. Sentencing Guidelines Manual ("Guidelines") § 1B1.3(a)(2), the concept is not without limits. Offenses constituting part of a common scheme or plan must be "'substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purposes, or similar *modus operandi*.'" United States v. Sheahan, 31 F.3d 595, 599 (8th Cir. 1994) (quoting Guidelines § 1B1.3, comment (n.9)). This determination is reviewed for clear error. United States v. Balano, 8 F.3d 629, 630 (8th Cir. 1993).

The only Eighth Circuit case exploring the limits of 1B1.3(a)(2) is United States v. Ballew, 40 F.3d 936 (8th Cir. 1994). Ballew was convicted of wire and mail fraud for falsely reporting to his insurance carrier that his truck was stolen. Investigation of the fraud revealed Ballew's involvement in several automobile thefts. Some parts from stolen vehicles had been put

---

[13]The only enhancements at issue are those attached to Counts XX and XXX (the customs violations). Counts II and VII added no units to Larson's combined offense level and so did not increase his sentence. See U.S. Sentencing Guidelines Manual § 3D1.4 and Evidentiary Hr'g at 3 (Jan. 16, 1996).

into the truck.  The district court relied on the thefts to impose a five-level increase in Ballew's base offense level.  We affirmed the sentence, reasoning that Ballew's use of parts from the stolen vehicles disguised the truck so he could continue using it.  Id. at 943.  In dissent, Judge Heaney argued that "the asserted connection is too tenuous to bind together these two discreet, identifiable units of crime into a single continuing offense."  Id. at 945.

Even if Ballew is correctly decided, the nexus between the convictions and the enhancements in Larson's case is considerably more tenuous.

Section 3B1.1(a) calls for a four-level increase for a defendant's leadership role.  The district court did name five conspirators, Evidentiary Hr'g at 64-65 (Jan. 16, 1996), but only Larson and his girlfriend were present for the actual customs violations.  The court does not address this issue at all; it simply asserts that the leadership enhancement was appropriate because Larson was a principal of the Institute.  Ante at 13.

Similarly, section 2S1.3(b)(1) adds two levels when the defendant knew the funds were proceeds of unlawful activity or were intended to promote unlawful activity.  Both the district court and this court assert that this enhancement was appropriate because the funds from the customs violations were purportedly intended to aid the United States conspiracy.

The vast majority of section 2S1.3(b)(1) cases involve the use of drug proceeds.  E.g., United States v. Mitchell, 31 F.3d 628, 633 (8th Cir. 1994).  There is only one case applying a 2S1.3(b)(1) enhancement based on the prospective use of funds.  In United States v. Packer, 70 F.3d 357, 361 (5th Cir. 1995), cert. denied, 117 S. Ct. 75 (1996), the defendant planned to use the funds in

question to support himself and his girlfriend in their flight to avoid her arrest. The court affirmed because the whole purpose of the transactions was the financing of the flight. <u>Id.</u>

Unlike <u>Packer</u>, the government here provided no evidence about Larson's plans for the money. The only arguable nexus between the trips and the fossil conspiracy is the general business done by the Institute. The exhibits do demonstrate that the Japanese travelers' checks were deposited into the Institute's account and the Peruvian travelers' checks were purchased with Institute money. One defendant did testify that the business was conducted to "support our, I guess, habit of collecting" fossils. Trial Tr. at 2902. These general connections were all that was established under even the most charitable reading of the record. This stretches the concept of relevant conduct well beyond <u>Ballew</u>. Further, there was <u>no evidence at all</u> about either the intended or the actual use of these monies.

Accordingly, I would affirm the convictions but, given the Rule 11(e) violation, I would remand the case to the district court for resentencing before another judge. We noted in our opinion in <u>Black Hills IV</u> that precedent supports sentencing by a different judge under these same circumstances. 43 F.3d at 416, n.7 (citing <u>United States v. Adams</u>, 634 F.2d 830, 835-54 (5th Cir. Unit A Jan. 1981)). Indeed, the decision by the court to deny Larson's request for recusal of the trial judge seems to run contra to our recent decision in <u>United States v. Washington</u>, No. 96-2586 (8th Cir. Mar. 24, 1997). In <u>Washington</u> we stated:

> Rule 11(e)(1) of the Federal Rules of Criminal Procedure provides that the district court "shall not participate" in any discussions concerning a possible plea agreement. This is an "absolute prohibition." <u>United States v. Adams</u>, 634 F.2d 830, 835 (5th Cir. 1981).

. . . .

> [Rule 11(e)(1)] also furthers "the sound principle that the
> interests of justice are best served if the judge remains aloof
> from all discussions preliminary to the determination of guilt
> or innocence so that his impartiality and objectivity shall not
> be open to any question or suspicion when it becomes his duty
> to impose sentence." United States v. Werker, 535 F.2d 198,
> 203 (2d Cir. 1976); accord Barrett, 982 F.2d at 195; Adams, 634
> F.2d at 840.

Id. slip op. at 6-7.

In Washington, the court construed our earlier opinion in Black Hills
IV and did not find "plain error" when the trial judge, who had also
acknowledged a Rule 11(e)(1) violation, failed to recuse himself sua sponte
from the sentencing phase of the trial. Id. slip op. at 7-8. However, the
court, by inference, seems to have held that a "request [for] a different
sentencing judge" by Washington would have made recusal mandatory. Id.
In this case, Larson timely demanded the recusal of the trial judge citing,
inter alia, our Adams footnote in Black Hills IV as authority for the
request. Appellant's App. at 57-58. Thus, under our decisions in Black
Hills IV and Washington, denial of Larson's motion for recusal was
reversible error.

Accordingly, I concur in that part of the court's opinion affirming
the conviction. I dissent from the court's view that the sentencing
procedure and the sentence were within the established law of this circuit.

A true copy.

     Attest:

          CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.