UNITED STATES of America,
Plaintiff–Appellee,

v.

David Olon HARRINGTON,
Defendant–Appellant.

No. 90–30103.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 9, 1990.

Decided Jan. 18, 1991.

As Corrected Feb. 1, 1991.

Steven Jacobson, Asst. Federal Public Defender, Portland, Or., for defendant-appellant.

Leslie K. Baker, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Before WRIGHT, POOLE and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

A jury convicted David Olon Harrington of armed bank robbery in violation of 18 U.S.C. § 2113(a), (d) (Count 1), carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1) (Count 2), and being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count 3). The district court sentenced Harrington to consecutive sentences of 300 months on Count 1, 60 months on Count 2, and 27 months on Count 3. Harrington appeals his conviction and his sentence. We affirm in part, reverse in part, vacate Harrington's sentence and remand for re-sentencing.

## FACTS

On November 3, 1987, at approximately 4:30 p.m., a man wearing a nylon stocking over his face entered the Far West Federal Bank in Oregon and yelled at everyone not to move. The branch manager activated the bank's alarm and surveillance cameras. During the robbery, the man brandished a gun in a threatening manner and pointed it at various tellers and customers. The man said the gun was a .357 magnum.

The man instructed the tellers to put all the money on the counter. One teller included "bait" bills in the money. After placing the money in a blue bag, the man ordered everyone to lie on the floor and threatened to kill anyone who watched him leave or attempted to follow him.

At 4:39 p.m. Officer Michael Schmitt received a radio call concerning the robbery. Officer Schmitt was approximately three blocks from the bank and drove immediately to the bank. One witness described the man to Schmitt and told Schmitt the direction in which he ran. Schmitt drove off in pursuit of the suspect.

Within a short distance, Schmitt saw a man running down the street. The man matched the description given by the witness and was carrying a blue bag. Schmitt called for assistance and drove slowly down the street in his marked police car after the suspect. The suspect continued to run, occasionally looking back at Schmitt. Schmitt parked his car in the middle of the street, ordered the man to stop and drew his gun. The man turned and fired several shots at Schmitt.

Because he was in a residential neighborhood, Schmitt decided not to shoot back. Schmitt ducked down in the driver's seat of the car and backed up. When the gun shots stopped, Schmitt looked up and saw the suspect running away. Following in his police car, Schmitt attempted to apprehend the suspect, but eventually lost sight of him.

During this time, police had surrounded the area. Officer Galen Tercek positioned himself approximately one hundred yards from where Schmitt last saw the suspect. About an hour later, Tercek saw the defendant come out from behind a house carrying a blue bag. The defendant fit the

general physical description of the man who robbed the bank and shot at Schmitt. Tercek repeatedly ordered the defendant to stop and at some point aimed his gun at the defendant. The defendant ignored Tercek and continued to walk toward some bushes. The defendant finally complied with Tercek's orders and began to lower himself to the ground. As he did so, he kept the blue bag in his left hand and tossed a revolver from his right hand.

Police apprehended the defendant and searched the blue bag. The bag contained approximately $8,759 in currency, including the bait bills from the bank. The gun was a .357 magnum loaded with five rounds.

A police dog led officers to a shed behind the house from which the defendant had emerged. In the shed, police officers discovered six empty .357 magnum caliber cartridge cases, and a jacket and pair of pants which Officer Schmitt identified as similar to the clothing worn by the man who shot at him.

The defendant's trial, conviction, sentence and this appeal followed.

## DISCUSSION

### A. Initial Seizure of Harrington

Harrington argues that when Officer Tercek drew his gun, pointed it at Harrington and ordered him to stop, the officer's display of force converted an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), into a *de facto* arrest for which, Harrington contends, probable cause was lacking. In the alternative, should we conclude the seizure was merely a *Terry* stop, Harrington argues that Tercek lacked reasonable suspicion to stop him.

We review de novo whether a seizure exceeded the bounds of a *Terry* stop and became a *de facto* arrest. *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987).

■ The use of force during a *Terry* stop does not convert the stop into an arrest if the force is justified by concern for the safety of the officer or others. *See United States v. Alvarez*, 899 F.2d 833, 838

(9th Cir.1990) (ordering defendant to leave car at gunpoint); *Buffington*, 815 F.2d at 1300–01 (ordering defendant to leave car and to lie down at gunpoint); *United States v. Taylor*, 716 F.2d 701, 708–09 (9th Cir.1983) (ordering defendant to leave car and to lie down in ditch at gunpoint and handcuffing defendant); *United States v. Jacobs*, 715 F.2d 1343, 1345–46 (9th Cir. 1983) (per curiam) (pointing gun at defendant and ordering her to "prone out").

■ Officer Tercek's concern for his safety justified his use of force to stop Harrington. The police were trying to apprehend a person involved in an armed robbery. Officer Tercek heard the police radio broadcast which reported that a person who fit Harrington's physical description robbed the bank at gunpoint and fired shots at another officer. Tercek confronted Harrington about 100 yards from where the bank robbery suspect was last seen and about an hour and ten minutes after the robbery. Tercek saw Harrington carrying a blue bag and he knew from the police broadcast that the robber had put the money in a blue bag. Finally, Harrington ignored Tercek's repeated orders to stop and approached bushes from where Tercek feared shots might be fired.

We conclude that Officer Tercek had a reasonable and articulable suspicion that Harrington was engaged in criminal activity. A *Terry* stop was thus justified, *see Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980), and under the circumstances, the officer's use of force did not convert Harrington's seizure into a *de facto* arrest. The seizure was lawful, and did not preclude admission into evidence of items recovered at the time of the seizure.

### B. Authentication of Evidence

At trial, Harrington denied robbing the bank. He testified an unnamed individual committed the robbery. Harrington said this individual gave him $20 and told him to run if he saw a police car. Harrington said he put the $20 in a pack of cigarettes he was carrying.

In its rebuttal, the prosecution called Officer Tercek. Tercek identified the items seized from Harrington when Harrington was arrested, and which were placed into an evidence bag by the police. Tercek examined the contents of the evidence bag, including a pack of cigarettes, and could not find a $20 bill or any currency amounting to $20 in the pack of cigarettes or in any other item in the bag.

Harrington argues that the district court erred by admitting the seized items into evidence and by permitting Officer Tercek to testify that he could not find $20 in the bag. Harrington does not dispute that the items in the bag were seized from him. He argues that the bag and its contents, which lacked $20 in the cigarette package or in the bag, were not properly authenticated because of an absence of proof of the chain of custody.

The admission of evidence is within the district court's discretion and reviewable under an abuse of discretion standard. *United States v. Black,* 767 F.2d 1334, 1342 (9th Cir.), *cert. denied,* 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 557 (1985). The authentication of evidence is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). If the evidence is an object connected with the commission of a crime, the proponent must also establish the chain of custody. *Gallego v. United States,* 276 F.2d 914, 917 (9th Cir.1960). The prosecution must introduce sufficient proof so that a reasonable juror could find that the items in the bag are in "substantially the same condition" as when they were seized. *Id.; see United States v. Jardina,* 747 F.2d 945, 951 (5th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 833 (1985). The district court may admit the evidence if there is a "reasonable probability the article has not been changed in important respects." *Gallego,* 276 F.2d at 917. Further, in the absence of any evidence of tampering, a presumption exists that public officers "properly discharge[ ] their official duties." *Id.*

The prosecution introduced sufficient evidence from which the district court could conclude that a reasonable juror could find the evidence had not been altered. Officer Tercek testified that he was present when Criminalist Johnson of the Gresham Police Department placed the items seized from Harrington into a bag and that the bag he examined at the time of trial contained all of the items seized from Harrington. Tercek identified a record attached to the bag which indicated where the bag had been from its seizure until the time of trial, and who had viewed or possessed the bag.

Notwithstanding the foregoing, Harrington argues that because Tercek was not the custodian of the bag, and could not testify from memory what items were seized from Harrington at the time of arrest, the prosecution failed to establish a sufficient chain of custody. Thus, Harrington contends, the district court should have excluded the evidence for lack of authentication.

Merely raising the possibility of tampering is not sufficient to render evidence inadmissible. *United States v. Vansant,* 423 F.2d 620, 621 (9th Cir.), *cert. denied,* 400 U.S. 835, 91 S.Ct. 72, 27 L.Ed.2d 68 (1970). The possibility of a break in the chain of custody goes only to the weight of the evidence. *Id.; United States v. Godoy,* 528 F.2d 281, 284 (9th Cir.1975) (per curiam). In addition, the prosecution was not required to call the custodian of the evidence. *See Gallego,* 276 F.2d at 917 (prosecution is not required to produce all persons who had possession of evidence).

We conclude that the district court did not abuse its discretion in admitting Officer Tercek's testimony and the bag of items into evidence.

## C. Sentencing

Harrington raises several objections to the district court's interpretation and application of the Sentencing Guidelines. We review de novo the district court's interpretation of the Sentencing Guidelines. *United States v. O'Neal,* 910 F.2d 663, 666 (9th Cir.1990).

## 1. Career Offender Classification

■ A court may classify a defendant as a career offender if the present offense is a crime of violence and the defendant has two prior felony convictions for crimes of violence.[1] United States Sentencing Commission, *Guidelines Manual*, § 4B1.1 (Oct. 1987). The definitions in section 4A1.2(e) concerning the computation of criminal history points apply when counting convictions for the career offender section. U.S. S.G. § 4B1.2, comment. (n.4). The district court may count a prior conviction if the conviction resulted in the defendant's incarceration during any part of the fifteen years prior to the commission of the present offense. U.S.S.G. § 4A1.2(e)(1).

Harrington contends that the district court erred in sentencing him as a career offender under section 4B1.1 of the Sentencing Guidelines. Harrington argues that his sentence for a 1964 robbery did not result in his incarceration within fifteen years of November 3, 1987, the date of the commission of the present offense.

On October 12, 1964, Harrington was sentenced to ten years for a bank robbery committed in August 1964. He was paroled for the 1964 robbery in 1966. Harrington was later sentenced to twenty years for a second bank robbery committed in October 1967. Based on this second robbery, a parole violator's warrant was issued on October 13, 1967 and executed on October 1, 1969. The parole board revoked Harrington's parole for the 1964 robbery and ordered him held until the expiration of the full term of his sentence for the 1964 robbery.[2]

Harrington argues he was not incarcerated as a result of the 1964 robbery when his parole for that robbery was revoked. Instead, he contends that by that time he was back in prison incarcerated for the 1967 robbery. Thus, he argues, any time served as a result of the 1964 robbery following his parole revocation is irrelevant and cannot be counted as falling within fifteen years of the present offense.

We reject this argument. It gives no effect to Harrington's revocation of parole. The fact is that following the revocation of his parole for the 1964 robbery, Harrington was incarcerated for both the 1967 robbery and the 1964 robbery. His incarceration for these offenses was within fifteen years of the commission of the present offense. *See United States v. Gardner*, 905 F.2d 1432, 1439 n. 5 (10th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 202, 112 L.Ed.2d 163 (1990) (court would count "sentence which was reinstated as a result of parole revocation and which was being served within the fifteen-year period"); *cf. United States v. Smith*, 905 F.2d 1296, 1303 (9th Cir.1990) (rejecting argument that court should count all concurrent sentences as one sentence to compute a defendant's criminal history).

Even if his incarceration for the 1964 robbery can be considered under the career offender section of the Guidelines, Harrington argues he is entitled to credit for the two years between the issuance and execution of the parole violator warrant. If he were given this credit, he contends, he would have been eligible for release from prison, insofar as the 1964 robbery is concerned, more than fifteen years before the date of the present offense.[3] This argument lacks merit.

---

1. The district court used the 1964 and 1967 robberies as the two prior felony convictions for crimes of violence.

2. Harrington's release date for the 1964 robbery was calculated in his presentence report. The full term of his sentence was calculated to expire July 23, 1977. Giving Harrington time off for mandatory release, the release date would be January 24, 1977. The application of good time credits further reduced the release date to December 29, 1974. Under any of these calculations, Harrington would have been serving time in prison for the 1964 robbery as of November

1972, the fifteen-year cutoff date under the career offender section of the Guidelines.

3. Harrington makes this calculation by computing the time he actually served in prison before he was placed on parole, the time he served after his parole was revoked, and the reduction of his sentence for good time credits. We express no opinion on the validity of these computations. Even if we were to accept them, Harrington's argument fails because as we conclude hereafter he is not entitled to the credit he seeks for the time between issuance and execution of the parole violator warrant.

At the time the parole violator warrant was issued and executed, the parole board had discretion either to execute the warrant immediately upon issuance or to defer execution until the expiration of the subsequent sentence. *See Shelton v. United States Bd. of Parole*, 388 F.2d 567, 575 (D.C.Cir.1967) (per curiam); *see also Moody v. Daggett*, 429 U.S. 78, 83–84, 97 S.Ct. 274, 277, 50 L.Ed.2d 236 (1976). Accordingly, the district court properly declined to credit the two years between issuance and execution of the parole violator warrant in calculating the period of incarceration under the career offender section.

### 2. *Offense Level*

██ Harrington argues that the district court improperly calculated his offense level. He contends the district court should have reduced his offense level for the armed robbery conviction by two points to avoid double counting for the use of a firearm. We disagree.

Because Harrington is a career offender, the district court calculated his offense level under section 4B1.1 (career offender). Under the career offender section, the appropriate offense level for armed robbery is 34. The career offender section provides, "If the offense level for a career criminal ... is greater than the offense level otherwise applicable, the offense level from the [career offender table] shall apply." U.S.S.G. § 4B1.1.

Had Harrington not been a career offender, his offense level would be 19. Harrington's offense level under the career offender section is greater than the offense level otherwise applicable. The district court, therefore, properly calculated Harrington's offense level under the career offender section as 34.[4]

### 3. *State Psychiatric Evaluation*

Harrington had a prior conviction in Oregon state court of attempted murder and attempted assault. When Harrington was sentenced on these state charges, the state trial court considered a psychiatric evaluation of Harrington which the court ordered pursuant to Oregon Revised Statutes § 161.735(1) (1989). Under this statute, if an Oregon state court judge believes a defendant may be a "dangerous offender,"[5] and upon motion of the district attorney, the state court must order an examination of the defendant by a psychiatrist or psychologist. Or.Rev.Stat. § 161.735(1) (1989). The psychiatrist or psychologist must file with the court a written report which includes an "evaluation of whether the defendant is suffering from a severe personality disorder indicating a propensity toward criminal activity." § 161.735(3). If, after considering the evaluation, the state court finds that the defendant is a dangerous offender, the court may increase the defendant's sentence.[6] § 161.735(6).

During the state-ordered psychiatric evaluation, Harrington made incriminating remarks. The state court sentenced Harrington as a "dangerous offender" after considering the evaluation which included the incriminating statements. The portion of the Oregon statute important to this appeal provides:

No statement made by a defendant under this section ... shall be used against the defendant in any civil proceeding or in any other criminal proceeding.

Or.Rev.Stat. § 161.735(4).

It appears the district court also used the Oregon psychiatric evaluation in sentencing Harrington. The district court initially stated, "I've read [the psychiatric evalua-

---

**4.** The prohibition in section 2K2.4, concerning the specific offense characteristic of possession of a firearm, is not relevant to a sentence like Harrington's which is governed by the career offender section.

**5.** A "dangerous offender" is an individual whose dangerousness requires an "extended period of ... custody ... for the protection of the public," Or.Rev.Stat. § 161.725 (1989), and who has "a

severe personality disorder indicating a propensity toward crimes that seriously endanger the life or safety of another." § 161.725(1), (2).

**6.** A defendant may receive a 30-year sentence if found to be a dangerous offender rather than the usual sentences of 10 years for a "Class B" felony and 20 years for a "Class A" felony. §§ 161.725, 161.605(1), (2).

tion] and—but it's not—they're not going to be the basis for the sentence that the court imposes." Reporter's Transcript, Vol. V at 554. However, in a subsequent "Findings of Fact Order," the district court found that section 161.735(4) "applies only to criminal actions filed by the State of Oregon or its political subdivisions and not to the United States." Findings of Fact Order at 3 (Mar. 6, 1990). The district court concluded that it could consider the evaluation "as it deems fit." *Id.*

■ Although a court may consider a wide variety of information in sentencing a defendant, a court may not consider information obtained in violation of the privilege against self-incrimination. *Jones v. Cardwell*, 686 F.2d 754, 756 (9th Cir.1982). In *Jones*, we held that the fifth amendment privilege applied to a state court's use of a defendant's statements in sentencing the defendant. *Id.* There, the defendant made incriminating statements to a state probation officer after receiving a court order to answer all questions. The probation officer also was aggressive in seeking confessions of additional crimes without giving the defendant warnings under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Based on these circumstances, we concluded that the statements were involuntary. *Jones*, 686 F.2d at 757. We held that the consideration of the defendant's involuntary statements by the sentencing judge violated the defendant's fifth amendment rights. *Id.*

We have also held that a state sentencing board's consideration of statements made by a defendant under assurances of confidentiality given by state hospital therapists violated the defendant's privilege against self-incrimination. *Pens v. Bail*, 902 F.2d 1464, 1466 (9th Cir.1990). In *Pens*, the defendant made incriminating statements to therapists in a court-ordered psychiatric program. The therapists assured the defendant that the statements would not be revealed to any court and that his cooperation was "necessary for successful treatment." *Id.* at 1465. We held that the use of the defendant's statements by the state sentencing board in imposing an exceptional minimum sentence violated the defendant's fifth amendment rights. *Id.* at 1466. We stated that even if an exceptional sentence was justified, "it may not be based on statements [the defendant] made in post-conviction, court-ordered, confidential treatment." *Id.*

In *Pens*, Washington state hospital therapists assured the defendant his statements would not be revealed to the courts. Here, the Oregon statute assured Harrington that, except for the Oregon state crimes of which he then stood convicted, his statements would not "be used against [him] in any civil proceeding or in any other criminal proceeding." Or.Rev.Stat. § 161.735(4) (1989). In *Pens*, the defendant's statements were used against him in a state sentencing proceeding. Here, Harrington's statements were used against him in a federal sentencing proceeding. The government argues this was permissible because Or.Rev.Stat. § 161.735(4) cannot limit what a federal court may consider in imposing sentence under federal law, so long as the federal court's consideration of the material at sentencing does not violate federal constitutional law.

■ The use of Harrington's statements, however, does violate federal constitutional law. His statements were made against the backdrop of the Oregon statute which assured him his statements would not be used against him in future criminal proceedings. Despite this assurance, it appears from the record that the district court considered "as it deem[ed] fit" the Oregon state psychiatric evaluation, which included Harrington's statements. Under *Pens*, this violated Harrington's constitutional privilege not to have incriminating statements used against him without his consent. We, therefore, vacate Harrington's sentence and remand for resentencing. In resentencing Harrington, the district court shall not consider the psychiatric evaluation.

## CONCLUSION

We affirm the district court on all issues except its apparent consideration of the psychiatric evaluation in sentencing Har-

rington. Accordingly, we AFFIRM in part, REVERSE in part, VACATE Harrington's sentence and REMAND to the district court for resentencing.