**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

CARLOS QUINTANA SOLORIO, Carlos
Quintana Solorio,
*Defendant-Appellant.*

No. 10-10304

D.C. No.
5:99-cr-20094-
RMW-1

OPINION

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, Senior District Judge, Presiding

Argued and Submitted
December 6, 2011—San Francisco, California

Filed January 19, 2012

Before: Diarmuid F. O'Scannlain and Marsha S. Berzon,
Circuit Judges, and Robert S. Lasnik, District Judge.*

Opinion by Judge Berzon

---

*The Honorable Robert S. Lasnik, United States District Judge for the
Western District of Washington, sitting by designation.

**COUNSEL**

Melinda Haag, United States Attorney, Barbara J. Valliere, Chief, Appellate Division, Assistant United States Attorney,

Laurie Kloster Gray (argued), Assistant United States Attorney, San Francisco, California, John N. Glang, Assistant U.S. Attorney, San Jose, California, for plaintiff-appellee United States of America.

Amitai Schwartz (argued), Law Offices of Amitai Schwartz, Emeryville, California, for defendant-appellant Carlos Quintana Solorio.

---

## OPINION

BERZON, Circuit Judge:

Carlos Quintana Solorio ("Solorio") was arrested during a Drug Enforcement Agency ("DEA") "buy bust" operation for arranging to sell methamphetamine to a government informant.[1] Following a jury trial, Solorio was convicted of possession with intent to distribute 500 or more grams of a substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii), and conspiracy to distribute 500 or more grams of a substance containing methamphetamine, in violation of 21 U.S.C. § 846.

Solorio now appeals his conviction on four grounds, contending that: (1) the trial court committed reversible plain error by not requiring interpreters to take an oath, pursuant to Federal Rule of Evidence 604, before translating the government informant's testimony at trial; (2) allowing two DEA agents to recount the "present sense impressions" of *other* nontestifying agents violated Solorio's right to confrontation; (3) there was insufficient evidence to prove, beyond a reason-

---

[1] A "buy bust" operation refers to an undercover narcotics operation designed to catch suspected drug dealers by feigning a drug purchase.

able doubt, that Solorio actually possessed methamphetamine; and (4) cumulative error warrants reversal.[2]

# I.

## Background

### A. Events preceding the "buy bust" operation

On May 5, 1999, Miguel Portillo-Rodriguez ("Portillo-Rodriguez") approached Solorio at a casino in San Jose, California and expressed an interest in buying drugs. Portillo-Rodriguez had worked as a government informant for nineteen years, earning $18,000-$19,000 annually and receiving immigration benefits for both himself and his family. Solorio, who was with a companion named Servando Jimenez ("Jimenez"), replied that he could sell Portillo-Rodriguez methamphetamine, and gave him a free drug sample.

Later that day, Portillo-Rodriguez went to the San Jose DEA office and informed Special Agent Hilda Rubino ("Rubino") of his meeting with Solorio and Jimenez. Portillo-Rodriguez gave Rubino the drug sample that Solorio had given him. The sample tested presumptively positive for methamphetamine in a non-conclusive field test and was sent to the Western Regional Laboratory in San Francisco for further testing. Based on the information Portillo-Rodriguez provided, Rubino opened a drug investigation.

Rubino began the investigation by instructing Portillo-Rodriguez to contact Solorio and arrange to buy five pounds of methamphetamine. Following that directive, Portillo-

---

[2]On appeal, the government lodged Solorio's Presentence Report ("PSR") with this Court and, in its answering brief, referred to the PSR for a prejudicial fact not before the jury. Solorio then filed a motion to strike the PSR and the government's reference to it. We deny Solorio's motion as unnecessary. The PSR and the information derived from it were not before the jury and are therefore irrelevant to our review.

Rodriguez called Solorio on May 12, 1999 and arranged to meet him for a drug sale that afternoon at a Costco store in San Jose. Solorio said on the call that he could obtain seven pounds of methamphetamine, and Portillo-Rodriguez agreed to buy that amount at $5,000 per pound. That price was consistent with the standard charge for methamphetamine in San Jose at the time.

DEA agents gave Portillo-Rodriguez a bag containing $25,000 cash, which Portillo-Rodriguez placed in the trunk of the car he drove to the arranged meeting spot. All went well at the outset: Solorio showed up at the Costco as planned, arriving in a gray van driven by Jimenez. After Portillo-Rodriguez showed him the money, however, Solorio responded that he did not have the drugs with him and suggested completing the deal at his work place, presumably that same day. Portillo-Rodriguez, however, had been instructed by DEA agents not to complete the deal anywhere else that day, as the agents had an operational plan set up specifically for the Costco location; moving the operation at that point would have raised safety concerns. So, rather than agreeing to Solorio's proposal, Portillo-Rodriguez agreed to call Solorio at a later time.

## B. The "buy bust" operation

Following up, Portillo-Rodriguez called Solorio on June 3, 1999. DEA agents were with Portillo-Rodriguez during the call and recorded the conversation, during which the men agreed to meet that afternoon to complete the drug deal. The meeting place arranged this time was near the body shop where Solorio worked. When Portillo-Rodriguez asked, "What's gonna be the, the number of people," which, according to the evidence at trial, was code for the number of pounds Solorio was selling, Solorio replied, "Five." Portillo-Rodriguez then asked, "[S]o after all it's not . . . all 7 weren't gonna go?" Solorio responded, "He couldn't," but assured Portillo-Rodriguez that the deal was for "sure."

As the men had discussed, Portillo-Rodriguez met Solorio near Solorio's workplace. At first, Solorio indicated once again that he did not want to complete the deal, this time explaining that he was "nervous because there was a van or vehicle there that he didn't like the looks of." Agent Rubino, who was monitoring the conversation, alerted other agents that the van, which was indeed a DEA surveillance vehicle, needed to be moved. Soon, the "suspicious" van left, and Jimenez joined Portillo-Rodriguez and Solorio. The three men then walked to a gray van that Portillo-Rodriguez recognized as the same one Solorio and Jimenez had driven to their previous meeting at Costco.

Solorio proceeded to raise the gray van's hood, and Jimenez took a black plastic bag out of a microwave oven in the back seat. According to Portillo-Rodriguez, there were "pound disks" of "coffee-colored" drugs inside the bag. Solorio explained that the disks were stained with coffee "to throw the dogs off." Portillo-Rodriguez told Solorio that he would get the money from his car and advised him not to lower the hood of the van. As Portillo-Rodriguez walked toward his car alone, he repeated the phrase "Lake Tahoe," the prearranged arrest signal. The two DEA arrest teams then descended upon the scene and arrested Solorio and Jimenez.

A total of approximately twenty agents were involved in the undercover operation, each assigned to one of a variety of responsibilities. About eight to ten of the agents conducted surveillance of the meeting. At least two of those agents broadcast their observations over a radio, one from a van "parked on a street overlooking the parking lot area," and one from an airplane overhead.[3] Other agents were assigned to the

---

[3]It is unclear precisely how many agents participated in the broadcasting. Rubino first testifies that, to the best of her recollection, there were two agents who broadcast their observations. Subsequently, however, she stated that she "heard radio traffic from different surveillance vehicles who were observing, in addition to the airplane that was observing."

arrest teams and charged with taking the suspects into custody once the arrest signal was given. Agent Kenneth Mazza, an arrest team member, was "a few blocks away," monitoring the live transmissions that the broadcasting agents sent over the radio. Agent Rubino monitored the body wire that Portillo-Rodriguez wore to the meeting and was assigned "to be security for" him. Rubino also listened to the radio traffic from the different surveillance vehicles and the airplane that were observing Solorio's actions. Like Mazza, Rubino was in a van parked "blocks away," and did not personally see the interactions among Portillo-Rodriguez, Solorio, and Jimenez. After Portillo-Rodriguez gave the "Lake Tahoe" arrest signal, Rubino informed the arrest team that "it was a bust" and that they should move in and arrest the subjects.

## C.  The methamphetamine

### 1.  Testimony of Agent Joseph Muenchow ("Muenchow")

As the assigned "finder" during the "buy bust" operation, Muenchow was responsible for maintaining custody and control of evidence. In that capacity, he was in charge of transporting any drugs back to the DEA office, processing them, and securing them until they could be sent to a laboratory for analysis.

After the arrest signal was given, Muenchow followed Mazza to the gray van where Solorio and Jimenez had taken Portillo-Rodriguez. Mazza pulled out a black plastic bag from a microwave on the back seat of the van and handed it to Muenchow. Muenchow opened the bag and observed "five disks" of an "off white, kind of powdery, chunky substance with some black particles sprinkled on them which appeared to be coffee grounds." The disks "were each individually wrapped in . . . a clear cellophane."

Muenchow took the drugs back to the DEA's San Jose office. There, he removed a "little bit of sample" from the suspected drugs and performed a presumptive field test—that is, a preliminary test that would indicate whether the substance was probably methamphetamine, but which was not definitive. The suspected drugs tested presumptively positive for methamphetamine. Muenchow then put the drugs in an evidence bag, filled out the label on the bag, and heat-sealed the bag. He then weighed the drugs, their packaging, and the evidence bag, determining that the gross weight was approximately 2,490 grams.[4] At that point, Muenchow put the evidence "in the temporary drug evidence safe pending transfer to the DEA West Regional Lab." He did not alter the evidence in any way before putting it into the evidence locker. Muenchow never again saw the drugs seized from Solorio.

At trial, the prosecution produced, and Muenchow identified, Government Exhibit 2 as the original evidence bag in which he had sealed the drugs. Describing the DEA protocol for transporting drugs from the evidence locker in San Jose to the Western Regional Laboratory in San Francisco, Muenchow stated, "When you get evidence, drug evidence, you fill out what's called a DEA 7, which is a report of seizure." Muenchow recounted that he had filled out such a report on the bag, which included the case number, exhibit number, weight, name of the person who had acquired and sealed the evidence (that is, Muenchow), name of a witness to the sealing, and the location and date of seizure. Below this information, Muenchow testified, the report had "a section for transport and custody," which contained the name of the agent who transferred the bag to the DEA lab and the signature of the lab custodian. Muenchow did not, however, have any personal knowledge of what happened to the bag after he placed it in the DEA safe in San Jose. Instead, he testified only that information inscribed on the DEA 7 indicated that the drugs seized from Solorio had been transported to San Francisco.

---

[4]2,490 grams equals approximately 5.5 pounds.

Muenchow also testified that his original heat seal on the bag had been broken and that the bag had been resealed. Consistent with Muenchow's testimony, the report on the bag reflects that it had been opened and resealed twice, once on September 15, 1999, and once on September 28, 2009, but does not say who did the reopening and resealing or why. Muenchow opened the evidence bag during the trial, observing, "Now [the drug's] no longer in disk form. It's chunky, off-white powdery substance which would have been done at the lab. . . . This looks like part of the original disks. . . . There is still some shape, part of a disk. It looks like they're quartered."

## 2.  Testimony of Brittany Huntington ("Huntington")

Huntington, a forensic scientist at the DEA laboratory in San Francisco, testified that she received Government Exhibit 2 on November 19, 2009. She described the exhibit as "three heat sealed bags that all contain the same powder in various sizes." Someone at the laboratory had handed her the bags; she did not know where they had come from before that. As soon as Huntington received the bags, she weighed them and determined the net weight of the drugs, excluding all the packaging, to be approximately 1,850 grams.[5] She then took about a gram and a half of the substance and performed tests on it, from which she concluded, with no doubt in her mind, that "all three of the powders within this packaging . . . contained methamphetamine." Upon examining the exhibit at trial, Huntington testified that "[t]he outer packaging is now cut open, but everything else is exactly the same."

In addition, Huntington testified that she tested Government Exhibit 1, which the prosecution represented to be the

---

[5]1,850 grams equals approximately 4.1 pounds. The amount Huntington received was thus nearly one and a half pounds less than the aggregate weight of the five "pound disks," their cellophane wrapping, and the black plastic bag they were originally in.

drug sample that Solorio had given to Portillo-Rodriguez on May 3, 1999. Huntington attested that she came into possession of this substance also on November 19, 2009, and that it came with "the previous chemists's report" and "the packaging sealed by that chemist." Through her analysis, Huntington identified that drug sample to be methamphetamine as well, and said that she was absolutely certain of the identification.

## D.    Trial

Solorio was tried by a jury in January 2010. Portillo-Rodriguez testified at length against him, in Spanish, with translation by interpreters Carol Rhine-Medina and Aracely Callaway. On the first day of trial, the court instructed the jurors:

> There may be Spanish language used during the trial. The evidence you are to consider is only that provided through the official court interpreter. Although some of you may know Spanish, it is . . . important that all jurors consider the same evidence. Therefore, you must accept the English translation and you must disregard any different meaning.

On the second day of trial, Rhine-Medina interpreted while Portillo-Rodriguez was sworn in; she was not herself administered an oath at that time. Solorio raised no objection to Rhine-Medina's failure to take an oath just before she translated or to her subsequent translation. The following day, Callaway translated for Portillo-Rodriguez. The court asked Callaway to remind Portillo-Rodriguez that he was still under oath, but, again, did not administer an oath at that time to Callaway herself. Once more, Solorio raised no objection to the translation or to the failure of the interpreter to take an oath just before beginning her translation.

Mazza, Rubino, Muenchow, and Huntington, also testified against Solorio. The government did not, however, introduce

as witnesses the agents who had actually observed Solorio's interactions with Portillo-Rodriguez and Jimenez during the June 3, 1999 "buy bust" operation. Instead, Mazza and Rubino testified about the surveillance observations of the nontestifying agents, which had been broadcast over the DEA radio system. Solorio objected to this testimony on hearsay grounds,[6] but the trial court overruled his objections, holding the testimony admissible under the present sense impression exception to the hearsay rule. *See* Fed R. Evid. 803(1).

Ultimately, the jury convicted Solorio of both possession with intent to distribute 500 or more grams of a substance containing methamphetamine and conspiracy to distribute 500 or more grams of a substance containing methamphetamine. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), 846.

## II.

## Discussion

### A. Interpreter oaths

Solorio raises for the first time on appeal his contention that the district court committed reversible error by failing to administer oaths to Portillo-Rodriguez's interpreters before they translated his testimony at trial. We review for plain error. *See United States v. Matus-Zayas*, 655 F.3d 1092, 1098 (9th Cir. 2011).

**[1]** Under the version of Federal Rule of Evidence 604 in effect at the time of Solorio's trial, "[a]n interpreter is subject to . . . the administration of an oath or affirmation to make a

---

[6]During a pretrial hearing, the prosecution notified the court that it intended to introduce "contemporaneous surveillance observations of non-testifying agents as present sense impressions under the hearsay rule." Solorio objected on both hearsay and Confrontation Clause grounds. The trial judge reserved his ruling on the objections at that point, and Solorio did not renew his Confrontation Clause objections at trial.

true translation." Fed. R. Evid. 604 (2010).[7] Interpreters who translate the testimony of witnesses on the stand are covered by this requirement. *See United States v. Taren-Palma*, 997 F.2d 525, 532 (9th Cir. 1993)*, abrogated on other grounds by United States v. Shabani*, 513 U.S. 10 (1994). Rule 604 does not, however, indicate whether such an oath must be administered in any particular manner or at any specified time, including whether the oath must be administered for each trial. The Administrative Office of the United States Courts ("AO"), has published guidelines on the administration of oaths to interpreters, observing that "[p]olicies with regard to the oath of interpreters vary from district to district and from judge to judge." 5 *Guide to Judiciary Policy* § 350(b) (2010). Although some courts administer oaths to interpreters each day, or once for an entire case, others "administer the oath to staff and contract interpreters once, and keep it on file." *Id.*

**[2]** We agree with the courts that proceed in the latter fashion that there is no requirement that the oath be administered during each trial. Most telling in that regard is the absence of any such requirement—or any indication as to how or when interpreters are to be qualified and their oaths administered—in Rule 604. In contrast, Rule 603, applicable to witnesses, specifies that the oath must be administered "[b]efore testifying," suggesting a temporal nexus to the actual appearance of each witness at a particular trial.[8] Unlike witnesses, an interpreter's role is not limited to a specific trial, and there is no apparent reason the oath need be either. In the absence of any requirement that the interpreter's oath be administered during

---

[7]Rule 604 was amended in 2011 for purely stylistic reasons and now reads, "An interpreter . . . must give an oath or affirmation to make a true translation." Fed. R. Evid. 604 (2011); *see* Fed. R. Evid. 604 advisory committee's note.

[8]Federal Rule of Evidence 603 was also amended in 2011 for purely stylistic reasons; the changes do not reflect an "intent to change any result in any ruling on evidence admissibility." Federal Rule of Evidence 603 advisory committee's note.

each new trial, it could not have been plain error for the trial judge to have failed to do so.

**[3]** The record does not, however, indicate that the interpreters took the requisite oath at *any* time.[9] Nonetheless, if they did not, and there was therefore error, any error did not affect Solorio's substantial rights, as is required for reversal on plain error review. *See Matus-Zayas*, 655 F.3d at 1098. We reject one strand of the government's argument as to why this is so: that the interpreters each "translated the oath to testify truthfully to the confidential informant, which served as a reminder of their own duty to faithfully translate." As noted, the Federal Rules of Evidence contain a separate rule requiring that witnesses be administered an oath prior to testifying. *See* Fed. R. Evid. 603 ("Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so."). That Rule 604, which is specifically directed at interpreters, exists *in addition* to Rule 603 indicates that the two rules impose independent requirements that must *both* be met. Thus, the fact that Rhine-Medina and Callaway helped administer oaths to Portillo-Rodriguez does not substitute for the Rule 604 requirement that they themselves be administered oaths.

**[4]** Solorio nonetheless cannot prevail on plain error grounds, as he has not shown prejudice arising from the trial court's possible error. Solorio does not challenge the accuracy of the translations by identifying potentially material mistakes or irregularities in the interpretation of Portillo-Rodriguez's tes-

---

[9]Of course, had the issue been raised at trial, it would undoubtedly have been clarified whether they did or not, and there is no indication that they did not. To avoid similar arguments on appeal in the future, it would be preferable for district courts to place on the record of each trial in which interpreters appear that proper qualification and oath-taking procedures have been followed.

timony.[10] Nor does he claim that either interpreter engaged in unlawful conduct. We agree with the Fifth Circuit that "[a]s to [court interpreters], the fundamental question is normally one of qualification, not of veracity or fidelity. In the absence of special circumstances, the latter qualities are assumed." *United States v. Perez*, 651 F.2d 268, 273 (5th Cir. Unit A July 1981). Because Solorio has not shown that he was prejudiced by any failure to administer Rule 604 oaths to Portillo-Rodriguez's interpreters, any error did not affect Solorio's "substantial rights" and therefore did not constitute plain error warranting reversal. *See Matus-Zayas*, 655 F.3d at 1098.

**[5]** Nor did any failure to administer oaths to Portillo-Rodriguez's interpreters, combined with the trial court's instruction that the jury could only consider the English translation presented by the interpreters, result in a Confrontation Clause violation. The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The interpreters, who only translated Portillo-Rodriguez's in-court statements, were not themselves witnesses who testified against Solorio. *See Taren-Palma*, 997 F.2d at 532 (distinguishing between a "language expert" who took the stand and testified about his out-of-court translation of a taped conversation and "interpreters who translate the testimony of witnesses on the stand"). Because Solorio had the opportunity to confront Portillo Rodriguez, the *actual* adverse witness, whose testimony the interpreters merely translated, there was no Confrontation Clause violation.

---

[10]Solorio identifies only a single discrepancy between Rhine-Medina's interpretation of Portillo-Rodriguez's testimony and the translated transcript of his conversation with Solorio on June 3, 1999. With respect to the hood of the van, which Solorio had put up, the transcript indicates that Portillo-Rodriguez said, "Don't take them down." In contrast, Portillo-Rodriguez clarified, through Rhine-Medina's interpretation, that he really said, "Don't put it down." If anything, however, this discrepancy affirms the accuracy of Rhine-Medina's interpretation, which, unlike the out-of-court translation, is consistent with the context of Portillo-Rodriguez's statement.

## B.  "Present sense impressions" of nontestifying agents[11]

We next consider whether the admission of Mazza's and Rubino's testimony violated Solorio's constitutional right to confrontation because the two agents recounted the present sense impressions of nontestifying agents. Solorio did not object on Confrontation Clause grounds to the admission of these statements at trial, so we review for plain error. *See Matus-Zayas*, 655 F.3d at 1098. We hold that the district court did not plainly err in admitting the statements; the remaining prongs of the plain error inquiry are therefore not pertinent. *See Wahid*, 614 F.3d at 1016 n.2.

**[6]** The Confrontation Clause covers only "testimonial" statements. See *Crawford v. Washington*, 541 U.S. 36, 51-52 (2004). Although the Supreme Court did not set forth a comprehensive definition of the term "testimonial" in *Crawford*, it provided examples of what falls within the "core class" of "testimonial statements":

> *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

---

[11]Solorio concedes that the contemporaneous observations of the nontestifying agents were properly admitted as "present sense impressions" under Federal Rule of Evidence 803(1). *See United States v. Gil*, 58 F.3d 1414, 1422 (9th Cir. 1995). He thus does not appeal the admission of these statements on hearsay grounds.

541 U.S. at 51-52 (first alteration in original) (internal citations and quotations omitted); *see also Jensen v. Piller*, 439 F.3d 1086, 1089 (9th Cir. 2006) (characterizing *Crawford*'s formulation of "testimonial" statements as statements "made to a government officer with an eye toward trial").

**[7]** Post-*Crawford* cases have clarified somewhat the limits of the testimonial statement category. First, *Davis v. Washington* held that statements made during a police interrogation "are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." 547 U.S. 813, 822 (2006). Next, *Michigan v. Bryant* reiterated that when "the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause." 131 S. Ct. 1143, 1155 (2011) (quoting *Davis*, 547 U.S. at 822). *Bryant* also explained that there can be an "ongoing emergency" even after the original threat to a victim has ceased to exist, so long as there is "a threat potentially to the police and the public." *Id.* at 1164; *see also id.* at 1157 ("An ongoing emergency has a[n] . . . effect of focusing an individual's attention on responding to the emergency."). Thus, while "statements made in the absence of any interrogation are [not] necessarily nontestimonial," *Davis*, 547 U.S. at 822 n.1, and the admissibility of a statement under a hearsay exception is not controlling with respect to Confrontation Clause analysis, *see Ocampo v. Vail*, 649 F.3d 1098, 1108 (9th Cir. 2011); *Ponce v. Felker*, 606 F.3d 596, 599 (9th Cir. 2010), statements made out-of-court with a primary purpose other than possible prosecutorial use are nontestimonial.

**[8]** In this case, the testimonial/nontestimonial distinction arises with regard to statements by two or more DEA agents on the scene, made before and during the drug sale for which Solorio was prosecuted. Those agents broadcast to other agents their contemporaneous observations of Portillo-

Rodriguez's interactions with Solorio and Jimenez. For reasons not explained in the record, the observing agents did not testify at trial. Solorio contends that "[t]he observations of the agents were formally recorded by Mazza and Rubino as present sense impressions in order that they could be used for prosecution purposes, to create a record for trial, if necessary." In contrast, the government maintains that the two agents communicated their observations to the other agents to ensure the success and safety of the operation, by assuring that all agents involved knew what was happening and enabling them to gauge their actions accordingly.

The record supports the government's characterization. The "buy bust" operation was a high-risk situation involving the exchange of a large amount of money and a substantial quantity of drugs. It took place near Solorio's work place, a location that he had selected, presumably because it placed him at a strategic advantage should anything go wrong. That Solorio was wary of the situation was confirmed by his initial reluctance to complete the deal when he saw the "suspicious" van —a van that was, in fact, a DEA surveillance vehicle. The agents also knew that Solorio was accompanied by Jimenez, but did not know whether the two men were armed. So the agents did not know exactly what might happen if Solorio discovered that the exchange was a set-up and that Portillo-Rodriguez was actually a government informant.

Under these circumstances, an objective observer could reasonably believe that the undercover operation posed a safety threat to Portillo-Rodriguez, and to the DEA agents on the scene were they found out. By reporting their contemporaneous observations over the radio, the nontestifying agents enabled the testifying agents to monitor the operation, to stay ready to protect Portillo-Rodriguez and the on-the-scene agents should it prove necessary, and to be promptly alerted when it was time for them to play their assigned roles once the arrest was triggered—in Mazza's case helping to arrest

Jimenez, and in Rubino's case, securing the informant, Portillo-Rodriguez.**[12]**

**[9]** The circumstances thus suggest that, like an "ongoing emergency," which "has a[n] . . . effect of focusing an individual's attention on responding to the emergency," *Bryant*, 131 S. Ct. at 1157, the undercover operation focused the surveilling agents' attention on reporting the unfolding events to others working with them. Accordingly, objectively assessed, the "primary purpose" of the agents' statements was assuring that the arrest effort both succeeded and did not escalate into a dangerous situation, not "to create a record for trial," *id.* at 1155.

Moreover, as the Supreme Court explained in *Bryant*, "because the prospect of fabrication in statements given for the primary purpose of resolving [an] emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination." *Id.* at 1157. Similarly, the "prospect of fabrication" in statements made for the principal purpose of ensuring the safety and success of an undercover operation is "significantly diminished." *Id.* Although, "after *Crawford* the 'obviou[s] reliab[ility]' of a testimonial statement does not dispense with the Confrontation Clause," *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2715 (2011) (alterations in original) (quoting *Crawford*, 541 U.S. at 62), that quality is informative in this case, as it was in *Bryant*, in determining whether the statement was or was not testimonial in the first place.

**[10]** We therefore hold that the district court did not plainly err in admitting the nontestifying agents' statements.

---

**[12]**Rubino testified that she was "responsible for the informant," which ordinarily meant "secur[ing] him and get[ting] him out of the area." She did not, however, specifically recall what she did in this instance once the arrest was triggered.

## C.  Sufficiency of evidence

Next, we address Solorio's argument that there was such a major gap in the chain of custody between the substance seized from him and the drugs produced at trial that there was insufficient evidence to convict him of possession with intent to distribute 500 or more grams of a substance containing methamphetamine. Solorio preserved this claim by making a Rule 29 motion at the close of evidence. We therefore undertake de novo review of the sufficiency of the evidence. *See United States v. Green*, 592 F.3d 1057, 1065 (9th Cir. 2010).

**[11]** To sustain Solorio's conviction under 21 U.S.C. § 841(a)(1), there must be sufficient evidence from which a rational juror could find, beyond a reasonable doubt, *see United States v. Nevils*, 598 F.3d 1158, 1163-65 (9th Cir. 2010) (en banc), that the substance seized from Solorio was, in fact, methamphetamine, and that the amount of methamphetamine seized was 500 or more grams. *See* 21 U.S.C. § 841(b)(1)(A)(viii). As to this factual question, the government relied largely, although not exclusively, on testimony regarding the testing results on a substance contained in a plastic evidence bag and said to be the methamphetamine seized during the raid on June 3, 1999. Solorio does not contend that the drug evidence was inadmissible.[13] Instead, the

---

[13]In this respect, this case diverges from the line of cases in which defendants have relied on alleged discrepancies in the chain of evidence to challenge the *admissibility* rather than *weight* of evidence. *See, e.g.*, *United States v. Edwards*, 235 F.3d 1173 (9th Cir. 2000); *United States v. Matta-Ballesteros*, 71 F.3d 754 (9th Cir. 1995); *United States v. Harrington*, 923 F.2d 1371 (9th Cir. 1991).; *Gallego v. United States*, 276 F.2d 914 (9th Cir. 1960). As we have held in those cases, before such evidence can be admitted, "[t]he prosecution must introduce sufficient proof so that a reasonable juror could find that the items [that the prosecution seeks to admit into evidence] are in 'substantially the same condition' as when they were seized." *Harrington*, 923 F.2d at 1374 (quoting *Gallego*, 276 F.2d at 917)). In other words, "[t]he district court may admit the evidence if there is a 'reasonable probability the article has not been changed in important

parties agree that "[t]he possibility of a break in the chain of custody goes only to the weight of the evidence." *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991).

The record supports conflicting inferences regarding whether the substance seized from Solorio on June 3, 1999, was the same as that tested by Huntington and produced at trial. On the one hand, Solorio argues that "the contents of the bag appeared to be different when they were produced at trial than when Agent Muenchow first sealed the bag." Whereas Muenchow had seized five "pound disks" that "were each individually wrapped in . . . a clear cellophane," and held in a black plastic bag, the substance produced at trial was "no longer in disk form," and was contained in "three heat sealed bags" that held "powder in various sizes." In addition, the evidence weighed nearly one and a half pounds less than the weight Muenchow had recorded, albeit this difference included the weight of the cellophane wrapping and the black plastic bag. The outer evidence bag had also been unsealed and resealed twice between when Muenchow had sealed it and when Huntington received it, by people and for reasons unidentified in the record. These facts could certainly support an inference that the contents of the evidence bag, as received by Huntington, may not have been in the bag when Muenchow originally sealed it, or that the contents had been materially altered before they reached Huntington.

On the other hand, the drugs produced at trial came to Huntington in an outer evidence bag that, according to Muenchow, looked like the one he had sealed and bore his report from 1999. The DEA 7 report also reflected that the drugs had

respects.' " *Id*. (quoting *Gallego*, 276 F.2d at 917). Because Solorio did not challenge the admissibility of the drugs, we do not rule on whether there was a "reasonable probability" that the drug evidence "ha[d] not been changed in important respects." *Id*. (internal quotation marks omitted).

been transported from San Jose to San Francisco. In addition, the substance seized by Muenchow had been an "off white, kind of powdery, chunky substance," and the substance produced at trial was likewise a "chunky, off-white powdery substance." Upon examining the evidence at trial, moreover, Muenchow observed, "This looks like part of the original disks. . . . There is still some shape, part of a disk. It looks like they're quartered."

**[12]** The methamphetamine produced at trial was well over 500 grams, as was required to convict Solorio, so the weight difference from the drugs seized was not material. *See* 21 U.S.C. §§ 841(b)(1)(A)(viii), 846. While no reasonable juror could conclude that the drug evidence remained unchanged, a reasonable juror could nonetheless infer that the evidence produced at trial consisted of remnants of the original methamphetamine disks in fragmented form. Such a juror could also conclude that although some of the drugs was missing, the chemical composition of the remaining drugs had not been altered.

We need not determine whether or not this permissible inference would be sufficient in itself for a reasonable juror to conclude beyond a reasonable doubt that the substance seized during the raid was methamphetamine, in the requisite amount. It need not be, as long as other evidence, combined with the inference premised on the contents of the bag, would permit a reasonable juror to conclude beyond a reasonable doubt that the substance seized from Solorio was methamphetamine. Viewing the record as a whole, not just the testimony concerning the evidence bag, there was sufficient evidence regarding the substance seized during the raid to sustain the verdict.

At their first meeting in the casino, Solorio told Portillo-Rodriguez that he could sell him methamphetamine. Solorio provided Portillo-Rodriguez with a small drug sample, which tested positive for methamphetamine based on both a pre-

sumptive field test performed by DEA agents and a subsequent laboratory analysis performed by Huntington. In addition, Portillo-Rodriguez spoke with Solorio on May 12, 1999 and agreed to buy seven pounds of methamphetamine at $5,000 per pound, which was consistent with the going rate for the drug in San Jose at the time. On June 3, 1999, prior to their afternoon meeting, Portillo-Rodriguez spoke again with Solorio and inquired how many pounds Solorio would be selling. When Solorio said five, Portillo-Rodriguez expressed surprise that it was not seven pounds. A rational juror could infer from this conversation that the men were discussing a methamphetamine deal, because Portillo-Rodriguez had previously agreed to buy seven pounds of methamphetamine from Solorio. Finally, the substance seized from Solorio tested positive for methamphetamine in the presumptive field test that Muenchow performed. Although Muenchow acknowledged that presumptive tests can yield false positives, a fact finder could still rely on the test as some evidence that the substance was methamphetamine.

[13] On the record as a whole, then, there was sufficient other evidence to fill any gap in the chain of custody for the bag carrying the drugs. Given that the jury resolved "a record of historical facts that supports conflicting inferences" in favor of the prosecution, *Nevils*, 598 F.3d at 1164 (citation and internal quotation marks omitted), and keeping in mind the "great deference" that a court of appeals must give to a jury verdict when reviewing for sufficiency of evidence, *United States v. Pelisamen*, 641 F.3d 399, 409 n.6 (9th Cir. 2011), we hold that a rational fact-finder could conclude, beyond a reasonable doubt, that the substance Solorio meant to sell to Portillo-Rodriguez was actually methamphetamine. *See United States v. Robinson*, 967 F.2d 287, 291-92 (9th Cir. 1992) (holding that there was sufficient evidence to support a defendant's conviction for possession with intent to distribute cocaine despite "a controversy regarding the chain of custody"), *abrogated in part on other grounds as recognized in Ortega-Mendez v. Gonzales*, 450 F.3d 1010, 1020 (9th Cir.

2006). There was therefore sufficient evidence to sustain the verdict.

## D.   Cumulative error

**[14]** There can be no cumulative error when a defendant fails to identify more than one error. *See United States v. Laurienti*, 611 F.3d 530, 551 (9th Cir. 2010). As discussed above, even if the trial court's failure to administer oaths to Portillo-Rodriguez's interpreters was plain error, the error did not affect Solorio's substantial rights. *See supra* Section II.A. Because Solorio has not identified any other error, there is no cumulative error warranting reversal.

***

For the foregoing reasons, we affirm Solorio's conviction.

**AFFIRMED.**